NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3027-17T4

AMY SKUSE,

       Plaintiff-Appellant,

v.

PFIZER, INC., JOHN D. WITZIG,
PAUL MANGEOT, and CONNIE
CORBETT, individually, jointly,
severally and/or in the alternative,

       Defendants-Respondents.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **January 16, 2019** |
| **APPELLATE DIVISION** |

Argued December 4, 2018 – Decided January 16, 2019

Before Judges Sabatino, Haas and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-2374-17.

Alan H. Schorr argued the cause for appellant (Schorr & Associates, PC, attorneys; Alan H. Schorr, on the briefs).

John M. Nolan argued the cause for respondents (Jackson Lewis, PC, attorneys; John M. Nolan, of counsel and on the brief; Carla D. Macaluso and Timothy M. McCarthy, on the brief).

John J. Sarno argued the cause for amicus curiae Employers Association of New Jersey (Ford & Harrison, LLP, attorneys; John J. Sarno and Mark A.

Saloman, of counsel and on the brief; Jeffrey A. Shooman, on the brief).

Richard M. Schall argued the cause for amicus curiae National Employment Lawyers Association of New Jersey (Schall & Barasch, LLC, attorneys; Richard M. Schall, on the brief).

Lowenstein Sandler, LLP, attorneys for amicus curiae New Jersey Civil Justice Institute (Gavin J. Rooney, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This case exemplifies an inadequate way for an employer to go about extracting its employees' agreement to submit to binding arbitration for future claims and thereby waive their rights to sue the employer and seek a jury trial.

The employer in this case emailed to its workforce what it called a "training module" (or "activity" or "course"). The module described the company's mandatory arbitration policy, as presented in a series of slides on computer screens. One screen provided employees with the opportunity to access a "Resource" link to the full text of the policy. In a separate email, the employer supplied a computer link to Frequently Asked Questions ("FAQs") concerning the policy.

On the third slide of the module presentation, the employees simply were asked to "acknowledge" it with the click of an electronic button. The module

declared that if an employee did not click the acknowledgement, but continued to work for the company for sixty or more days, the employee would be "deemed" to be bound by the arbitration policy.

Although the arbitration policy is labeled an "agreement" and that word appears multiple times on the slides and within the linked policy, the module did not request employees to provide signatures conveying their agreement. Nor were the employees asked – within the four corners of the pivotal "click" box at the end of the presentation – to memorialize that they expressly agreed to the policy. They were only asked within the box to "acknowledge" it.

This oblique procedure does not yield the valid personal agreement of an employee to give up his or her statutorily protected rights to litigate claims against an employer in a public forum and seek a trial by jury. The procedure falls short of the requirements of New Jersey contract law, particularly the Supreme Court's longstanding precedent in Leodori v. CIGNA Corp., 175 N.J. 293, 303 (2003) (holding an employee's valid waiver of statutory rights, there in the context of an employer's binding arbitration policy, "results only from an explicit, affirmative agreement that unmistakably reflects the employee's assent") (emphasis added), as well as the Court's more recent opinion in Atalese v. U.S. Legal Services Group, L.P., 219 N.J. 430, 447 (2014) (holding the words of an arbitration agreement "must be clear and unambiguous that a [person] is

<u>choosing</u> to arbitrate disputes rather than have them resolved in a court of law") (emphasis added).

The plaintiff employee never expressed in written or electronic form her explicit and unmistakable voluntary agreement to forego the court system and submit her discrimination claims against her former employer and its officials to binding arbitration. Consequently, we reverse the trial court's order dismissing her complaint and compelling arbitration. We do so without prejudice to the company appropriately revising its approach in the future.

I.

In November 2017, plaintiff Amy Skuse filed a complaint in the Law Division against her former employer Pfizer, Inc. ("Pfizer"), and several other Pfizer officials.[1] Plaintiff's complaint alleges a violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -49, based on religious discrimination, and a failure to provide reasonable accommodation for her religious beliefs.

<u>The Vaccination Dispute</u>

---

[1] The named individual codefendants are: John D. Witzig – Pfizer's Vice President of Corporate Aviation, a direct manager of plaintiff; Paul T. Mangeot – Pfizer's Chief Pilot, Fixed Wing, another direct manager of plaintiff; Connie Corbett – Pfizer's Human Resources Director; and fictitiously named parties John Does 1-10. We refer to the defendants hereafter collectively as "Pfizer" or "defendants," unless otherwise indicated by the context.

The complaint makes a host of allegations, most of which we need not repeat here for purposes of our forum analysis, and which have yet to be proven. The following summary of plaintiff's complaint will suffice.

Plaintiff worked for Pfizer as a flight attendant, beginning in 2012. Her principal place of employment was out of Pfizer's airport facility in West Trenton.

Plaintiff is a practicing Buddhist. As part of her religious beliefs, plaintiff "does not, and never has as an adult, received any injections that contain any kind of animal protein."

Pfizer has a company policy requiring that its flight attendants receive a yellow fever vaccine. Plaintiff did not receive such a vaccine. According to her complaint, plaintiff was not pressured to do so by the company until on or around April 17, 2017. On that occasion, defendants Witzig and Mangeot allegedly met with her and gave her an "ultimatum" to receive the vaccination within thirty days or else be terminated.

Plaintiff declined to receive the vaccination, which apparently contains animal-derived ingredients. According to her complaint, she informed Pfizer she had a valid "yellow card" waiver authorizing her to travel to any country without the vaccination. She presented a letter from her physician, documenting that she elected not to receive the vaccination because of "philosophical reasons

that are similar to a religious belief." Nonetheless, defendants allegedly continued with their ultimatum and intensified the pressure on her to get the vaccine.

In early May 2017, plaintiff suffered a breakdown, allegedly from the company's threats. Defendants granted her a leave from work, pursuant to the Family Medical Leave Act, N.J.S.A. 34:11B-1 to -16. When plaintiff was medically cleared to resume work two months later, defendants refused to allow her to return. They instead placed her on an indefinite paid leave.

Plaintiff then filed a formal request with Pfizer for an accommodation from the yellow fever vaccination requirement, specifically citing her "strong religious conviction." She met with Corbett to discuss that request.

Following the meeting, Corbett sent plaintiff a letter denying her request for religious accommodation. Plaintiff sought internal review of this decision, apparently with Pfizer's human resources division. Pfizer denied that internal appeal.

On August 11, 2017, Pfizer terminated plaintiff's employment.

Plaintiff filed the instant lawsuit about three months later. In response to the complaint, defendants filed a motion seeking to dismiss this action and compel plaintiff to submit her claims to binding arbitration. The motion invoked

the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 to 16, and the New Jersey Uniform Arbitration Act, N.J.S.A. 2A:23B-1 to -32.

The Company's Arbitration "Training Module"

The key issue before us is whether the parties entered into a valid mutual agreement to arbitrate plaintiff's claims.

Pfizer emphasizes that plaintiff electronically received and completed a training module presenting the company's mandatory binding arbitration policy. Plaintiff thereafter continued working for the company for thirteen months until she was discharged. Pfizer argues that through this process plaintiff thereby assented to, and must be bound by, the arbitration policy.

Plaintiff counters that she never expressed her agreement to the arbitration policy. She insists she did not waive any of her rights to litigate against Pfizer under the State's anti-discrimination and employment laws.

The "training module" (also referred to as an "activity" or "course") used to disseminate Pfizer's arbitration policy was transmitted to thousands of its employees by email, linking to company's computer-based training portal. As described in a motion certification by the company's "Enterprise Learning Architect," Robert M. Baker, the mass transmission was conducted in May 2016 through emails "assigning" to each employee recipient "the activity of taking an

on-line module to <u>review</u> the [company's] Mutual Arbitration and Class Waiver Agreement and Acknowledgement."  (Emphasis added).

The emails contained a link that the employees were expected to click to launch the module through the same portal "Pfizer employees use for many of their assigned trainings."  The company imposed a deadline of July 4, 2016 for employees to complete the assigned module activity, on which date the policy would become effective.

A link provided, via a separate email, gave employees the ability to access FAQs concerning the new mandatory policy.  The FAQs included, among other things, the following questions and answers:

> 4.  Do I have to agree to this?
>
> The Arbitration Agreement is a condition of continued employment with the Company.  <u>If you begin or continue working for the Company sixty (60) days after receipt of this Agreement.  It will be a contractual agreement that binds both you and the Company</u>.
>
> 5.  Can I change any parts of the agreement that I do not like?
>
> <u>No, you cannot change any of the terms</u> of the Arbitration Agreement.
>
> 6.  Do I give up any rights under the Arbitration Agreement?
>
> Please review the Arbitration Agreement carefully to fully understand its terms and conditions. <u>By agreeing to the Arbitration Agreement through</u>

continuing your employment with Pfizer, you are giving up the right to bring employment-related claims covered by the Agreement against Pfizer in a court of law. Instead, you are agreeing to arbitrate those claims before a neutral arbitrator. You are also agreeing to bring those claims on an individual basis and not on a class action, collective action, or representative action basis. Pfizer is also giving up the right to bring employment-related claims covered by the Agreement against you in court and is agreeing to bring any such claims on an individual basis in arbitration.

[(Emphasis added).]

The parties' appendices contain screenshots of the module's four computer slides[2] that presented Pfizer's arbitration policy. The first slide states:

As a condition of your employment with Pfizer, you and Pfizer agree to individual arbitration as the exclusive means of resolving certain disputes relating to your employment. This agreement is contained in the Mutual Arbitration and Class Waiver Agreement. It is important that you are aware of the terms of this Agreement.

The next page contains the Mutual Arbitration and Class Waiver Agreement. You will be able to review and print the Agreement. You will then be asked to acknowledge your receipt of the Agreement.

[(Emphasis added).]

The second slide states:

---

[2] Defendants also have provided a slide of the initial page for the module, which simply allows the employee to choose to scroll through the module in either English or Spanish.

A-3027-17T4

9

> Click the "Resources" tab in the upper-right corner to review the Agreement.
>
> Once it is opened, you may print the Agreement and retain for your records.
>
> After reviewing the [A]greement, close the window and return to this page.

According to Baker's certification, the Resources link on this second slide "allowed" an employee to open and review the arbitration agreement. The link also gave an employee "the opportunity" to print the agreement.

Assuming it is accessed through the Resources link, the company's five-page, single-spaced arbitration policy makes clear that, with certain categorical exceptions not pertinent here (such as worker's compensation claims), "all disputes, claims, complaints, or controversies . . . that [a Pfizer employee] ha[s] now or at any time in the future may have against Pfizer and/or any of its . . . current and former officers, directors, [or] employees . . . arising out of and/or directly or indirectly related to . . . [the employee's] employment with the Company . . . and/or termination of [the employee's] employment with the Company . . . will be resolved by arbitration and NOT by a court or jury." Pertinent to this case, the covered claims specifically include claims for "wrongful discharge, discrimination, and/or harassment."

The linked document states, in all capital letters, that "The parties hereby forever waive and give up the right to have a judge or jury decide any covered

claims." The document goes on to spell out various other procedures, terms, and conditions, including such things as the sharing of arbitration fees and the confidentiality of the arbitration process.[3]

The third slide states:

> I understand that I must agree to the Mutual Arbitration and Class Waiver Agreement as a condition of my employment. Even if I do not click here, if I begin or continue working for the Company sixty (60) days after receipt of this Agreement, even without acknowledging this Agreement, this Agreement will be effective, and I will be deemed to have consented to, ratified and accepted this Agreement through my acceptance of and/or continued employment with the Company.
>
> [(Emphasis added).]

Below this language on the third slide appears a rectangular box with rounded corners. On the right side of the box is a circled diagonal arrow pointing upward. Next to the arrow are these four words: "CLICK HERE to acknowledge." (Emphasis added).

The final slide states, "Thank you for reviewing the Mutual Arbitration and Class Waiver Agreement. Please send any questions you have on the Mutual Arbitration and Class Waiver Agreement to ArbitrationProgram@pfizer.com. Click 'Exit' to exit this course." (Emphasis added).

---

[3] Plaintiff has not argued the text of the arbitration policy insufficiently explains the policy.

The Motion Practice

Plaintiff submitted a certification to the trial court in response to Pfizer's motion to dismiss and compel arbitration, in which she stated, in pertinent part:

> In summary, I never saw an email about Arbitration, I never took any Arbitration training, I never read or saw any Arbitration Agreement, and <u>never agreed</u> to arbitrate any claims of discrimination. I did not [waive], and would never have knowingly waived my rights to sue or to have the right to have my complaint of discrimination decided by a jury.
>
> [(Emphasis added).]

In response to this certification, Pfizer presented its own certifications of two company representatives, with accompanying exhibits. One certification came from Baker, the company's Enterprise Learning Architect. The other was from Edward Gramling, Senior Corporate Counsel in Pfizer's Legal Division and head of its Discovery Group. Gramling attached copies of the emails sent to plaintiff on May 5, May 6, and June 9, 2016 about the company's arbitration policy.

The May 5, 2016 email was from Pfizer's Executive Vice President for Worldwide Human Resources. That email, which included a hyperlink to the Agreement and the FAQs, stated in part:

> Later today, you will receive a message from the P2L training program to <u>read and acknowledge the [arbitration] agreement</u>. I request that you read the agreement and review the FAQs before <u>acknowledging</u>

the agreement. . . . All covered colleagues will be bound by the agreement as part of their continued employment at Pfizer.  If you have any questions, I encourage you to review the FAQ's and/or refer your questions to ArbitrationProgram@pfizer.com.

[(Emphasis added).]

The automated email sent to plaintiff the next day from Pfizer's online training system, stated, in pertinent part:

Greetings Amy Skuse,

You have been assigned the activity Mutual Arbitration and Class Waiver Agreement and Acknowledgement . . . for the following reason: As a condition of your employment with Pfizer, you and Pfizer agree to individual arbitration as the exclusive means of resolving certain disputes relating to your employment.  This agreement is contained in the Mutual Arbitration and Class Waiver Agreement.  It is important that you are aware of the terms of this Agreement.

[(Emphasis added).]

As explained by Baker, an employee who clicked through the first three training module slides, including the button acknowledging the arbitration agreement, would be recorded as "completing" the module in Pfizer's training records.  He attached a copy of plaintiff's digital records showing that she started and completed the module on June 9, 2016.

Baker noted that Pfizer employees have a unique computer login identification and password, which they are prohibited by the company from

"revealing, sharing or making available" to others. According to Baker, employees who complete the training module are sent an automated email confirming such completion. He attached the email to plaintiff, sent on June 9, 2016, confirming her completion of the module. The message states, "Amy Skuse, [y]ou have completed the following training: . . . Mutual Arbitration and Class Waiver Agreement and Acknowledgement . . . ." (Emphasis added).

Plaintiff neither stipulates to nor disproves her receipt of these various emails. Instead, she maintains that she "was never asked nor required to acknowledge or agree [to the binding arbitration policy], and therefore the factual question as to whether she even saw the policy is irrelevant."

Before ruling on Pfizer's motion to dismiss the lawsuit and refer plaintiff's discrimination claims to binding arbitration, the motion judge asked if the parties wanted a hearing to address the issue of "the denial by the plaintiff that she ever saw the arbitration agreement," or if they instead "want[ed] the [c]ourt to decide the issue without the hearing." Plaintiff's counsel responded that such an evidential hearing would be "both unnecessary and an unwieldy situation. In order for us to have a plenary hearing, we would . . . take the depositions of all these people who are saying that they . . . put this on the computer. We'd need to get our computer experts to take a look at this to see how this system works." Accordingly, plaintiff's counsel requested the trial court, for purposes of the

motion to dismiss and compel arbitration, "to assume that Amy Skuse got the email and that she saw the screen that said, I acknowledge receipt of this policy."

The Motion Ruling

After considering the parties' contentions, the motion judge issued an oral opinion, with an accompanying written order, granting defendants' motion on February 21, 2018. In her oral opinion, the judge observed that Pfizer's acknowledgment procedure "nowhere specifically asks plaintiff to confirm that she has received the agreement." Even so, the judge was persuaded that, given plaintiff's continued employment well-past the specified sixty days and "[i]n light of the text on the slides and plaintiff's action or inaction, plaintiff's apparent intent was to be bound by this agreement." The court therefore dismissed plaintiff's complaint with prejudice, and directed her to proceed with arbitration, pursuant to the terms of the company's policy.

This Appeal and the Amici

Plaintiff timely appealed the trial court's order compelling arbitration, pursuant to Rule 2:2-3(a) and Wein v. Morris, 194 N.J. 364, 380 (2008). She is joined in her arguments for reversal by amicus National Employment Lawyers Association of New Jersey ("NELA-NJ"), an organization of private New Jersey attorneys who represent workers in employment litigation. Meanwhile, Pfizer's arguments seeking affirmance of the motion order are supported by two

employer-oriented amici: the Employers Association of New Jersey ("EANJ"), and the New Jersey Civil Justice Institute ("NJCJI"). This court granted all three amici organizations leave to participate in the appeal. We appreciate their helpful briefs and contributions to the appellate oral argument.

## II.

### A.

We begin our forum analysis by recognizing the federal and New Jersey legislative policies generally favoring arbitration as a dispute resolution process, in situations where that process has been mutually chosen by the parties. Atalese, 219 N.J. at 440, 442; see also 9 U.S.C. §§ 1 to 16; N.J.S.A. 2A:23B-1 to -32 (our State's Arbitration Act, which is nearly identical to the FAA).

Consistent with these statutory policies, "a state cannot subject an arbitration agreement to more burdensome requirements than those governing the formation of other contracts." Leodori, 175 N.J. at 302. However, a state can regulate arbitration agreements "by applying its contract-law principles that are relevant in a given case." Ibid.

One of the fundamental elements of contract law is the requirement of the contracting parties' mutual assent. "A legally enforceable agreement requires 'a meeting of the minds.'" Atalese, 219 N.J. at 442 (quoting Morton v. 4 Orchard Land Tr., 180 N.J. 118, 120 (2004)). "Parties are not required 'to arbitrate when

they have not agreed to do so.'" Ibid. (quoting Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989)).

As the United States Supreme Court recognized when construing the FAA in AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011), state-law principles governing contract formation apply to arbitration agreements. If there is no meeting of the minds as to the material terms of an arbitration agreement, or the material terms are internally inconsistent or too vague or indefinite to be enforced, a court has the authority to decline to compel arbitration. See, e.g., NAACP of Camden Cty. East v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 425, 431 (App. Div. 2011) (declining to enforce a car dealership's arbitration provisions where its contract forms were internally inconsistent and too vague and indefinite in several material respects).

Common-law principles of waiver also bear upon the analysis. At times a contractual provision will express a waiver by one or both parties giving up certain rights they may otherwise possess. "An effective waiver requires a party to have full knowledge of [his or her] legal rights and intent to surrender those rights." Knorr v. Smeal, 178 N.J. 169, 177 (2003) (citing W. Jersey Title & Guar. Co. v. Indus. Tr. Co., 27 N.J. 144, 153 (1958)).

In the context of a contractual arbitration, a necessary waiver would evidence a relinquishment of a party's right to pursue a lawsuit against the other

party in court and instead have the claims resolved in arbitration. "By its very nature, an agreement to arbitrate involves a waiver of a party's right to have [his or her] claims and defenses litigated in court." Atalese, 219 N.J. at 442 (quoting Foulke, 421 N.J. Super. at 425). Here, the issue of waiver specifically concerns the waiver of an employee's right under the LAD to sue in Superior Court an employer who has engaged in alleged discriminatory conduct and seek a jury trial to resolve that claim. See N.J.S.A. 10:5-13.

Our case law has extended these requirements of mutual assent and knowing and voluntary waiver to the setting of arbitration provisions contained within employment relationships. For the last fifteen years, the guiding precedent on this subject in our State has been the Supreme Court's 2003 opinion in Leodori, 175 N.J. 293.

The plaintiff in Leodori was employed by the defendant insurance company. Id. at 295. During the plaintiff's tenure as an employee, the company had a policy purporting to require all of its workers to submit to binding arbitration of any employment disputes. Id. at 296. The arbitration policy was contained in a handbook distributed to all employees, including the plaintiff. Ibid. The handbook was accompanied by an "acknowledgement form," which included an acknowledgment of the employee's receipt of the handbook and a recitation that the employee understood the handbook contained information on

company policies. Id. at 297. However, the acknowledgment form did not contain any language specifically referring to arbitration. Ibid. A separate "Employee Handbook Receipt and Agreement" form accompanied the handbook and described the arbitration as a term of employment. Id. at 297-98. Leodori signed the "acknowledgement" form, but he did not sign the "agreement" form. Ibid.

After Leodori was terminated, he sued the company in the Law Division for the company's alleged violation of his rights under the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8. Id. at 299. The trial court dismissed the case based on its finding that the parties had entered into a binding arbitration agreement, and this court reversed that ruling. Ibid.

On review, the Supreme Court upheld this court and ruled that the company's arbitration policy was unenforceable against Leodori because he had not conveyed his knowing and voluntary agreement to that policy. Id. at 305. Writing for the Court, Justice Verniero announced the basic tenet that "an arbitration provision cannot be enforced against an employee who does not sign or otherwise explicitly indicate his or her agreement to it." Id. at 306.

The Court's opinion in Leodori further instructed that "a waiver-of-rights provision must reflect that an employee has agreed clearly and unambiguously to arbitrate the disputed claim." Id. at 302 (emphasis added). Such a valid

waiver "results <u>only</u> from an <u>explicit affirmative agreement</u> that <u>unmistakably</u> reflects the employee's assent." <u>Id.</u> at 303 (emphasis added). The "critical inquiry" is whether plaintiff "surrendered [her] statutory rights knowingly and voluntarily." <u>Id.</u> at 305.

The Court did recognize the practical burden that large employers may encounter in attempting to obtain such voluntary assent from their employees to waive their rights to sue and submit to arbitration. <u>Id.</u> at 307. Given that practical concern, the Court made clear its holding was "not to be construed as requiring employers to negotiate individual agreements with their entire workforce to implement a company-wide arbitration policy." <u>Id.</u> at 307. As guidance, the Court stated that the employer in <u>Leodori</u> would have substantiated its employee's mutual assent and waiver if it either: (1) obtained the plaintiff's signature on the arbitration agreement, or (2) specified on the acknowledgment form, which the plaintiff did sign, that he had not only "received," but also "agreed" to the arbitration policy. <u>Ibid.</u> An acknowledgement form signed by the employee need not recite "verbatim" the arbitration policy, "so long as the form refers specifically to arbitration in a manner indicating [the] employee's assent, and the policy is described more fully in an accompanying handbook or in another document known to the employee." <u>Ibid.</u> The Court emphasized, "with minimal effort, employers can revise the

language to include an indication that the recipient has received <u>and agreed</u> to an arbitration policy." <u>Ibid.</u>

In the ensuing decade and a half since the Court's opinion in <u>Leodori</u>, our courts have faithfully applied its principles demanding the parties' manifested clear assent to arbitrate. <u>See, e.g.</u>, <u>Foulke</u>, 421 N.J. Super. at 425; <u>Rockel v. Cherry Hill Dodge</u>, 368 N.J. Super. 577, 581 (App. Div. 2004); <u>Kamaratos v. Palis</u>, 360 N.J. Super. 76, 82-83 (App. Div. 2003). Although it is not an employment case, the Supreme Court's seminal opinion on this general topic in <u>Atalese</u>, 219 N.J. at 447, reaffirmed that the words of an arbitration agreement "must be <u>clear and unambiguous</u> that a [person] is <u>choosing</u> to arbitrate disputes rather than have them resolved in a court of law." (Emphasis added); <u>see also</u> <u>Kernahan v. Home Warranty Adm'r of Fla., Inc.</u>, __ N.J. __ (2019) (reaffirming the importance of the requirement of clear mutual assent to arbitrate).

### B.

We apply these settled legal principles to the methods used by Pfizer to attempt to extract plaintiff's agreement to arbitrate. In doing so, our review of the trial court's legal conclusions is de novo. <u>Atalese</u>, 219 N.J. at 446. Like the trial court, we accept the factual concession of plaintiff's counsel that we are to assume, for sake of the analysis, that she did receive the pertinent company emails and did "click" the acknowledgement box at the end of the presentation.

As a starting point, we note a major technological difference between the setting in Leodori and the present case, namely an employer's use of an electronically transmitted "training module" to communicate and impose the terms of its mandatory arbitration policy. Unlike the employer in Leodori, Pfizer did not request or obtain physical signatures from the employees who were supplied with the policy. Instead, Pfizer attempted to secure its employees' assent to the policy through the use of digital techniques.

Pfizer, along with amici EANJ and NJCJI, urge us to affirm the trial court's ruling as an appropriate decision for our digital age. We recognize that in our current world, much of an employer's regular communications to its employees, and work-related communications between and among fellow employees, occurs through email and other digital means. A recent 2018 study revealed that an American worker spends, on average, 3.1 hours each weekday checking work email.[4]

Another present reality is that office employees tend to be inundated with a high volume of incoming email messages, and also send out a large number of their own emails. A global study of email statistics reported that, "in 2014, the

---

[4] See 2018 Adobe Consumer Email Survey, SlideShare, https://www.slideshare.net/adobe/2018-adobe-consumer-email-survey. The same study found that employees also spend, on average, 2.5 hours each weekday checking their personal email. Ibid.

majority of email traffic [came] from the business world, which account[ed] for over 108.7 billion emails sent and received per day."[5]  As of 2014, business users, on average, reportedly sent and received 121 emails daily, and that figure was projected to increase to 140 emails per day by 2018.[6]

Although the rapid growth of email traffic has advantages of convenience and efficiency, it can be difficult, even for conscientious office workers, to keep up with the unrelenting emails flowing into their email inboxes.  We take judicial notice that, in order to deal with this deluge, people frequently skim (or scroll through without reading) written material sent to them digitally, such as when they download computer applications online, or receive impersonal messages or announcements from organizations.  People also are prone to bypass links to other documents without meticulously opening and reading the contents of those links.  Such habits, although perhaps not always commendable, have become digital survival mechanisms used to separate the proverbial wheat from the chaff.

---

[5]  See The Radicati Group, Inc., Email Statistics Report, 2014-2018 3 (Sara Radicati ed., 2014), http://www.radicati.com/wp/wp-content/uploads/2014/01/Email-Statistics-Report-2014-2018-Executive-Summary.pdf.

[6]  Id. at 4.

A-3027-17T4

We do not mean to discourage employers from using email to disseminate company policies and announcements. The difficulty is assuring that the most important employer messages are actually read and understood by the workforce, and, where the law requires it, responded to with the employees' knowing and explicit assent.

The digital communications in this case occurred in the important context of an employer soliciting a waiver of an employee's statutory rights. In that context, it is critical, as <u>Leodori</u> mandates, that the digital communications substantiate an employee's "explicit, affirmative <u>agreement</u> that <u>unmistakably</u> reflects the employee's <u>assent</u>" to a binding arbitration policy. 175 N.J. at 303 (emphasis added).

The company's binding arbitration agreement was conveyed through what defendants have rather euphemistically called a "training module" or "training activity." As Baker's certification noted, the portal is commonly used by Pfizer employees "for many of their assigned <u>trainings</u>." (Emphasis added). These prosaic labels do not fairly capture the essence of the endeavor, i.e., an effort to extract an employee's knowing and voluntary <u>agreement</u> to <u>waive</u> important rights that have been bestowed upon him or her by law.

Obtaining an employee's binding waiver of his or her legal rights is not a training exercise. It is not on a par with routine or mundane training subjects,

such as how to obtain an assigned space in an employee parking lot or process a travel voucher.

We appreciate that Pfizer's arbitration module was previewed by mass emails announcing the forthcoming module and "assigning" employees to complete it. Even so, these inapt euphemisms dilute the legal significance and necessary mutuality of the contractual process. An employer must do more than "teach" employees about the company's binding arbitration policy. The employer must also obtain its employees' explicit, affirmative, and unmistakable assent to the arbitration policy, in order to secure their voluntary waiver of their rights under the law. Leodori, 175 N.J. at 303.

As is the custom with most employers, Pfizer's arbitration policy is non-negotiable. An employee cannot refuse to agree to the terms of the policy and remain employed with Pfizer, except for proven retaliatory or discriminatory conduct or some other statutory or contractual violation by the employer in responding to the employee's refusal. Nonetheless, the policy must be presented in a fashion that produces an employee's agreement and not just his or her awareness or understanding.

There is reason to doubt that all Pfizer employees who were sent the training module necessarily accessed and read the arbitration policy through the "Resources" tab on the third slide. The company's Enterprise Learning

Architect, Baker, describes the link to the Resources tab merely as an "opportunity" that is "allowed." Hence, there cannot be confidence that an employee actually took the time and effort to activate the tab and read the contents of the document linked to it.

A critical shortcoming of the company's procedure to obtain its employees' individual assent to waive their rights is the "click box" that appears at the end of the presentation. The opening slide of the module tells employees that, after being presented with the policy, they will "then be asked to acknowledge [their] receipt of the Agreement." As the Court ruled in Leodori, an employee's mere receipt of the company's arbitration policy was not enough to make it enforceable against him. Id. at 307. The employee instead needed to manifest an "explicit, affirmative agreement" that reflects he "unmistakably" assented to it. Id. at 303.

The four-word click box on the module's third page selectively uses the verb "acknowledge" and does not use the verb "agree." We realize that other portions of the slides do contain and repeat the words agree and agreement. But the only portion of the module that calls for a response by the employee is the critical click box. Before encountering that box, the employee is not asked to initial key portions within the arbitration policy, as often is done with other important legal documents such as a car loan or a house purchase.

Pfizer understandably wants the employee's click in the training module to substitute for a physical signature. The click is a crucial part of the mutual offer-and-acceptance exchange. Some employees surely will skip to the click box at the end of the presentation without paying close or any attention to the verbiage that preceded it. They may well rush to complete the assigned training activity before the company deadline. In keeping with the tenets of Leodori, it is vital that this momentous segment of the module make "unmistakably" clear that the employee is voluntarily <u>agreeing</u> to the arbitration policy, and not simply acknowledging it.[7]

Here, the intended meaning of the term "acknowledge" in the click box was clouded by the opening slide explaining that the employee would be asked at the end of the presentation to "acknowledge [his or her] <u>receipt</u>" of the company's form agreement – not mentioning the employee's need to also convey his or her assent to its terms. (Emphasis added). Moreover, the final slide merely thanks the employee for "reviewing" the document. The whole process is called a "training activity." Communications so vital to the mutual process of

---

[7] Although sometimes the word "acknowledge" might be considered a synonym of the word "agree," the former term can reasonably be thought to mean simply to "recognize" the existence of something. <u>See</u> <u>Merriam-Webster's Collegiate Dictionary</u> 11 (11th ed. 2003). For example, one might "acknowledge" the high price of a new car without "agreeing" to pay it.

contract formation should not hinge upon loose and inconsistent wording that is reasonably capable of being misunderstood as something short of an agreement.

These deficiencies can be easily cured. For instance, rather than euphemistically calling the process a unilateral "training" activity, the company could identify the process to employees with terms that more accurately convey what it actually must be: for example, an agreement and a waiver of rights.

More importantly, to comply with the tenets of Leodori, 175 N.J. 293, the click box which seeks an employee's legally binding response should contain the word "agree" or "agreement." For example, it could say, "Click here to convey your agreement to the terms of the binding arbitration policy and your waiver of your right to sue." We will not prescribe in rigid fashion the exact language that should be immediately next to the click button, but the words used should have close proximity and prominence and contain the critical word "agree" or "agreement." The weaker term "acknowledge" does not suffice.[8]

In Leodori, the Court states it would have sufficed for the employer in that case to revise the acknowledgement form to recite that "the employee had agreed to the more detailed arbitration provision contained in the handbook." Id. at 307

---

[8] Our discussion in this regard should not be construed as a prohibition upon employers routinely transmitting company policies to workers through email and asking them to acknowledge those policies. Nor do we intend to disallow employers from seeking agreement to arbitration policies electronically if appropriately conducted consistent with this opinion.

(emphasis added). We realize the words "agree" and "agreement" appear several times on the slides in Pfizer's module and also within the linked policy. In Leodori, the employees were asked to provide their physical signatures on the company's form, a process that reflects formality. Id. at 297. Here, the employee's momentary click of a button or an electronic mouse lacked equivalent formality when that click was not tethered to and spotlighted with a clear and proximate direction that, by clicking the button, the employee is knowingly agreeing to waive his or her legal rights. Given these deficiencies, the use of the words "agree" and "agreement" outside of the click button is not sufficient to satisfy the requirements of Leodori in this case.

Similar to the Court's discussion in Leodori, compliance with contract formation and waiver principles could be accomplished with relative ease. The company may have strategically decided to omit the word "agree" from the click box because using that term might cause some employees to balk and to question the arbitration policy. Regardless of why Pfizer formatted the language to say "acknowledge," it still holds the cards by demanding assent from its workers as a condition of continued employment. If an at-will employee refuses to agree to the policy, he or she can be shown the door, unless his or her discharge is otherwise prohibited by law.

The more straightforward method the law requires may well generate discussions by employers with some workers who may hesitate to provide their electronic agreement. But the temporary inconvenience to companies in having such discussions would be offset by the benefit of achieving legally enforceable mutuality and clarity. Indeed, we suspect that very few, if any, employees would refuse to agree to the policy if they knew such refusal would cause them to lose their jobs. Nonetheless, their assent must be procured in a proper manner.

In sum, the wording and method of Pfizer's training module is inadequate to substantiate an employee's knowing and unmistakable assent to arbitrate and waive his or her rights of access to the courts. The trial court's decision validating the company's "acknowledgement" process is accordingly reversed.

C.

We turn to defendants' separate argument that plaintiff is "deemed" to be bound by Pfizer's mandatory arbitration policy because she continued to work for Pfizer for more than sixty days after receiving the arbitration agreement. This is certainly what the third slide on the module states. Such a proclamation of "consent by default" is legally insufficient, however, to satisfy the requirements of explicit and unmistakable employee assent prescribed by Leodori.

The motion judge relied on <u>Jaworski v. Ernst & Young U.S. LLP</u>, 441 N.J. Super. 464 (App. Div. 2015), in concluding that Pfizer's sixty-day "deemer" provision was legally sufficient to manifest plaintiff's assent to the arbitration policy, because she worked at the company for over a year after the policy was disseminated via the training module in May 2016 and became effective in July 2016. We respectfully disagree with that analysis.

In <u>Jaworski</u>, three employees challenged their agreement to their employer's binding arbitration policy, as it had been amended in 2007. <u>Id.</u> at 467. Two of the employees had signed employment agreements that "unambiguously referenced and assented to the terms of the [arbitration program], including the 2007 amendments," and the panel in <u>Jaworski</u> found them bound by those terms. <u>Id.</u> at 473.

A third employee, Holewinski, involved a more difficult case. He signed an employment agreement after enactment of the initial arbitration program, but did not sign anything after the 2007 amendments. <u>Ibid.</u> Rather, he continued working for five years after receiving notification via email of the 2007 amendments. <u>Id.</u> at 471, 474. The initial agreement Holewinski signed included a provision concerning future possible termination or amendment of the arbitration program, stating:

> [The company] may propose termination or amendment
> of the program at any time by providing notice to

> Employees through the Daily Connection [daily email bulletin] or other electronic notice. <u>An Employee indicates his or her agreement to the proposed amendment or termination, and such proposed changes become effective as to that Employee, by continuing his or her employment with [the employer] for at least three days after the notice is provided</u>.
>
> [<u>Id.</u> at 469.]

The panel in <u>Jaworski</u> held that Holewinski was still bound by the 2007 amendments because "[n]ot only did Holewinski continue with [the company] after the Effective Date, thus manifesting his intent to be bound pursuant to the unambiguous and specifically-emphasized terms of the Program, he did so for an additional five years until his termination in 2012." <u>Id.</u> at 474.

The circumstances of Holewinski addressed in <u>Jaworski</u> are distinguishable from those of plaintiff in this case. Unlike Holewinski, who had previously supplied his signed agreement to an arbitration policy, plaintiff in this case never signed an agreement, or otherwise unmistakably agreed, at any time, to waive her rights to litigate discrimination claims in court.[9]

Moreover, with all due respect to our colleagues in <u>Jaworski</u>, we cannot reconcile the panel's analysis with the Supreme Court's mandate in <u>Leodori</u> for an "explicit, affirmative agreement that unmistakably reflects [an] employee's

---

[9] We note that, as an alternative to an appropriately-designed click, it would have sufficed for Pfizer to have utilized a "touch screen" or other electronic method for employees to supply their signatures in electronic form.

assent" to arbitration, 175 N.J. at 303, and "concrete proof" of a waiver of an employee's rights to a jury trial and to litigate discrimination claims in court. Id. at 307.

The sixty-day provision here is the company's unilateral declaration. In essence, it is an attempt to bypass the evidential requirements of Leodori, so that employees who do not communicate their voluntary agreement to the arbitration policy will be imagined to have provided such agreement if they keep reporting to work for longer than two months. The provision, which is set forth on the very same acknowledgment slide we have found to be inadequate, unacceptably circumvents the Supreme Court's tenets. It also makes the clicking process on the module, even if that process had comported with our law's mutuality and waiver requirements, essentially redundant or meaningless after sixty days.

Unless and until the Supreme Court alters its precedent in Leodori, we respectfully decline to follow our sister panel's ruling in Jaworski. The sixty-day provision, in the absence of separate evidence – apart from continued employment – of the employee's affirmative assent to be bound by the arbitration policy, does not salvage defendants' position.[10]

---

[10] At oral argument on appeal, we posed to defense counsel the hypothetical of whether a placard displayed by a company at its employee entrance announcing such a sixty-day "deemer" would be sufficient to substantiate an employee's agreement to arbitrate, if employees entering the building were instructed to read the placard before heading to their work stations. Defense counsel did not

Our legal conclusion should not be misread as signifying any views about the public policies that relate to binding arbitration of employment claims. We respect and adhere to the guidance of the FAA and the Supreme Courts of the United States and of this State on the subject. We simply apply established precedent in holding that the employer in this case did not do enough to obtain its employees' agreement to arbitrate. With some modest changes, the employer should be able to do so in the future.

Lastly, we note that, at the oral argument, defense counsel alerted us to a recent November 2018 unpublished opinion of a federal district judge in Pennsylvania who upheld Pfizer's arbitration policy, based on an employee's continued service for more than sixty days after receiving the training module. We do not cite to that unpublished opinion, see Rule 1:36-3, nor do we choose to follow it. The case involved the application of Pennsylvania contract law and did not, as here, require adherence to New Jersey law, including our State Supreme Court's decisions in Leodori and Atalese that robustly prescribe explicit and unmistakable expressions of mutual assent to arbitrate.

---

believe offhand that such a placard procedure would be legally inadequate. We have doubts such a procedure would comport with Leodori.

For these reasons, the trial court's order compelling arbitration is reversed and the case is restored to the Law Division's docket.[11]

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[11] In light of our ruling, we need not reach other arguments raised by plaintiff.

A-3027-17T4

35