SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court.  In the interest of brevity, portions of an opinion may not have been summarized.

## Amy Skuse v. Pfizer, Inc. (A-86-18) (082509)

**Argued February 3, 2020 -- Decided August 18, 2020**

**PATTERSON, J., writing for the Court.**

In this appeal, the Court reviews the trial court's decision dismissing plaintiff Amy Skuse's complaint against her former employer, Pfizer, Inc., and ordering arbitration of her employment discrimination claims.

Pfizer's Human Resources Department sent an e-mail to Pfizer employees at their corporate e-mail addresses announcing Pfizer's five-page Mutual Arbitration and Class Waiver Agreement (Agreement) and included a link to that document.  The following language appeared in bold font on the final page of the Agreement:

> You understand that your acknowledgement of this Agreement is not required for the Agreement to be enforced.  If you begin or continue working for the Company sixty (60) days after receipt of this Agreement, even without acknowledging this Agreement, this Agreement will be effective, and you will be deemed to have consented to, ratified and accepted this Agreement through your acceptance of and/or continued employment with the Company.

The e-mail also included a included a link to a document that listed "Frequently Asked Questions," including "Do I have to agree to this?" to which the response indicated, "The Arbitration Agreement is a condition of continued employment with the Company.  If you begin or continue working for the Company sixty (60) days after receipt of this Agreement, it will be a contractual agreement that binds both you and the Company." The "FAQs" document also encouraged any employee who had "legal questions" about the Agreement "to speak to [his or her] own attorney."

Additional e-mails assigned the "Mutual Arbitration and Class Waiver Agreement and Acknowledgment" as part of Pfizer's module-based training program, noting that agreement to individual arbitration was a condition of employment, and included a link to launch that module, which consisted of four slides.  The first slide noted that agreement to individual arbitration was a condition of employment; the second contained

1

instructions for opening the Agreement; the third slide contained language similar to the final page of the Agreement (reproduced above); a box with an arrow pointing upward to that language instructed the employee to "CLICK HERE to acknowledge." The fourth slide thanked the employee for reviewing the Agreement, provided an e-mail address for questions, and included a means to exit the "course."

Pfizer terminated Skuse's employment in August 2017, and Skuse filed a complaint alleging that Pfizer and the individual defendants violated the Law Against Discrimination by terminating her employment because of her religious objection to being vaccinated for yellow fever. Defendants moved to dismiss the complaint and to compel arbitration. Skuse opposed the motion, contending that she was not bound by Pfizer's Agreement, arguing that she was asked only to acknowledge the Agreement, not to assent to it, and that she never agreed to arbitrate her claims.

The trial court dismissed Skuse's complaint and directed her to proceed to arbitration in accordance with the Agreement. The Appellate Division reversed, identifying three aspects of Pfizer's communications to Skuse as grounds for its decision: Pfizer's use of e-mails to disseminate the Agreement to employees already inundated with e-mails; its use of a "training module" or a training "activity" to explain the Agreement; and its instruction that Skuse click her computer screen to "acknowledge" her obligation to assent to the Agreement in the event that she remained employed for sixty days, not to "agree" to the Agreement. 457 N.J. Super. 539, 555-61 (App. Div. 2019). The Court granted certification. 238 N.J. 374 (2019).

**HELD:** Pfizer's Agreement and related communications informed Skuse that if she remained a Pfizer employee more than sixty days from her receipt of that Agreement, she was deemed to assent to it. Those communications clearly and unmistakably explained the rights that Skuse would waive by agreeing to arbitration, thus complying with waiver-of-rights case law, and Pfizer's delivery of the Agreement by e-mail did not warrant its invalidation. Pfizer's use of the word "acknowledge" was appropriate in the circumstances of this case, given the terms of Pfizer's arbitration policy and other expressions of assent that immediately preceded that request. Pfizer should not have labeled its communication explaining its arbitration agreement a "training module" or training "activity," but that is not a basis to invalidate the Agreement. The Agreement was valid and binding, and the Court concurs with the trial court's decision to enforce it.

1. Federal law specifically permits states to regulate contracts, including contracts containing arbitration agreements, under general contract principles. For any waiver-of-rights provision to be effective, the party who gives up rights must have full knowledge of his legal rights and intent to surrender those rights. New Jersey case law requires that a waiver-of-rights provision be written clearly and unambiguously. In an employment setting, employees must at least know that they have agreed to arbitrate all statutory claims arising out of the employment relationship or its termination. (pp. 18-23)

2. Applying those principles, Pfizer's Agreement and its related communications clearly informed Skuse that by continuing to be employed for sixty days, she would waive her right to pursue employment discrimination claims against Pfizer in court. New Jersey contract law recognizes that in certain circumstances, conduct can constitute contractual assent. Pfizer informed employees, with the clarity that New Jersey's waiver-of-rights law requires, that continued employment after the policy's effective date would constitute acceptance of the Agreement's terms. Further, as required by case law, Pfizer clearly explained to Skuse the rights that she would relinquish if she remained employed after the policy's effective date and thereby assented to the Agreement's terms. The Agreement's language complied with the Court's mandate in Atalese v. U.S. Legal Services Group, L.P., 219 N.J. 430, 446 (2014), that a waiver-of-rights provision clearly and unambiguously state that the plaintiff is "waiving her right to sue or go to court to secure relief." Pfizer's communications also explained in general terms what arbitration, the agreed-upon method of dispute resolution, would entail, with no confusing references to mediation as in Kernahan v. Home Warranty Administrator of Florida, Inc., 236 N.J. 301, 323-26 (2019). Finally, Skuse's LAD claim was indisputably included in the Agreement's broad language describing the employment-related claims subject to arbitration, and it does not fall within the exceptions to that policy enumerated in the Agreement. (pp. 23-28)

3. The Court next considers the method by which Pfizer chose to deliver its Agreement and accompanying communications to Skuse. Even if Skuse were to contend that she did not review Pfizer's e-mails and their attachments because of the volume of e-mails addressed to her -- which she does not -- her failure to review Pfizer's communications would not invalidate the Agreement. Under case law, any contention by Skuse that she completed Pfizer's e-mailed module without reading its contents or the documents linked to it would have no impact on the analysis. Moreover, no principle of New Jersey contract law bars enforcement of a contract because that contract is communicated by e-mail, rather than by the transfer of a hard-copy document. And here, nothing in the e-mailed communications in this case concealed the Agreement or understated its importance. The Court does not share the Appellate Division's view that Pfizer's decision to communicate the Agreement and related materials to its employees by e-mail warrants invalidation of the Agreement. (pp. 28-33)

4. The Court agrees with the Appellate Division that Pfizer's characterization of its slides summarizing the Agreement as "training" was a misnomer. When it disseminates an arbitration agreement, an employer may choose to use tools developed for its training program. The employer should not, however, label those communications as "training." Although a reference to "training" in an employer's communication of an arbitration policy might be regarded as misleading an employee in a different setting, however, Pfizer's use of the term does not invalidate the Agreement in the circumstances here. (pp. 33-34)

3

5.  This case is distinguishable from <u>Leodori v. CIGNA Corp.</u>, 175 N.J. 293, 305-07 (2003).  Here, what Skuse was asked to "acknowledge" -- what she did "acknowledge" -- was her understanding that she "must agree" to the Agreement, and that whether or not she clicked the "acknowledge" button, she would be deemed to have "consented to, ratified and accepted" the Agreement through her continued employment at Pfizer.  Although the word "acknowledge" could be vague or misleading in a different setting, it was an appropriate term as used here.  (pp. 35-40)

**The judgment of the Appellate Division is REVERSED, and the trial court's order is REINSTATED.**

**JUSTICE ALBIN, concurring,** is persuaded by the totality of the evidence that plaintiff clearly and unmistakably understood that she was agreeing to submit any disputed employment issue to an arbitrator rather than a court and notes that plaintiff has not raised the argument that the arbitration provision constituted an illicit, industry-wide contract of adhesion.  Justice Albin cautions, however, that when every employment and consumer contract contains such a clause across an entire profession or industry, when employees and consumers have no choice but to waive their right to resolve their disputes in a judicial forum in order to get a job or buy a good, the Court will have to address a more profound question:  Are such contracts of adhesion contrary to New Jersey's most fundamental public policy -- the constitutional right to a civil jury trial -- and therefore unconscionable and unenforceable under the Federal Arbitration Act and its state counterpart?  That is the great issue that will confront the Court, in Justice Albin's view.  In his concurrence, Justice Albin sets the stage for what is at stake.

**CHIEF JUSTICE RABNER, dissenting,** notes that the Appellate Division decision carefully parses the online "training module" defendant Pfizer used and explains why the module lacks clear and unmistakable proof that Pfizer's employees agreed to waive the right to have their day in court.  Chief Justice Rabner fears that today's opinion not only sanctions what took place but also ushers in a new day for arbitration agreements.  Going forward, Chief Justice Rabner asks, what employer will ask an employee to <u>agree</u> to settle a dispute through arbitration and waive the right to proceed in court if it is enough simply to ask the employee to <u>acknowledge</u> she received a statement of company policy and deem consent from her continuing to show up for work?  More is required to show clear and unmistakable assent in any context, Chief Justice Rabner explains, and more should be required before employees are asked to give up their constitutional and statutory rights to have their day in court.

**JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PATTERSON's opinion.  JUSTICE ALBIN filed a concurrence.  CHIEF JUSTICE RABNER filed a dissent.  JUSTICE TIMPONE did not participate.**

4

# SUPREME COURT OF NEW JERSEY
## A-86 September Term 2018
### 082509

Amy Skuse,

Plaintiff-Respondent,

v.

Pfizer, Inc., John D. Witzig,
Paul Mangeot, and Connie Corbett,
individually, jointly, severally and/or
in the alternative,

Defendant-Appellants.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
457 N.J. Super. 539 (App. Div. 2019).

| Argued | Decided |
|---|---|
| February 3, 2020 | August 18, 2020 |

Thomas A. Linthorst argued the cause for appellants
(Morgan, Lewis & Bockius and Jackson Lewis, attorneys;
Thomas A. Linthorst, Sam S. Shaulson, John M. Nolan,
Carla D. Macaluso, and Timothy M. McCarthy, on the
briefs).

Alan H. Schorr argued the cause for respondent (Schorr
& Associates, attorneys; Alan H. Schorr, on the briefs).

David R. Kott argued the cause for amici curiae New
Jersey Business & Industry Association, Commerce and
Industry Association of New Jersey, and New Jersey
Chamber of Commerce (McCarter & English, attorneys;

1

David R. Kott and Edward J. Fanning, Jr., of counsel and
on the brief, and Steven H. Del Mauro, on the brief).

Andrée P. Laney argued the cause for amicus curiae
Employers Association of New Jersey (Ford & Harrison
and Employers Association of New Jersey, attorneys;
Mark A. Saloman, of counsel and on the brief, and
Jeffrey A. Shooman, on the brief).

William D. Wright argued the cause for amicus curiae
New Jersey Association for Justice (The Wright Law
Firm, attorneys; William D. Wright and David T. Wright,
on the brief).

Richard M. Schall argued the cause for amicus curiae
National Employment Lawyers Association of New
Jersey (Schall & Barasch, attorneys; Richard M. Schall,
on the brief).

Leah S. Robinson submitted a brief on behalf of amicus
curiae Chamber of Commerce of the United States of
America (Mayer Brown, attorneys; Leah S. Robinson,
Archis A. Parasharami, of the District of Columbia bar,
admitted pro hac vice, and Daniel E. Jones, of the District
of Columbia bar, admitted pro hac vice, on the brief).

Gavin J. Rooney submitted a brief on behalf of amicus
curiae New Jersey Civil Justice Institute (Lowenstein
Sandler, attorneys; Gavin J. Rooney and Justin Corbalis,
on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

In this appeal, we review the trial court's decision dismissing plaintiff

Amy Skuse's complaint against her former employer, Pfizer, Inc., and ordering

arbitration of her employment discrimination claims.

2

In 2016, four years after it hired Skuse, Pfizer notified her of a new arbitration policy that would become a condition of her employment. Under that policy, if an employee continued to work for Pfizer for sixty days after receiving a copy of Pfizer's Mutual Arbitration and Class Waiver Agreement (Agreement), that employee would be deemed to have assented to the Agreement, waived the right to litigate in court several categories of employment-related claims, and agreed to arbitrate those claims. Skuse opened e-mails that linked to the Agreement, completed a "training module" regarding the arbitration policy, and clicked a box on her computer screen that asked her to "acknowledge" her obligation to assent to the Agreement as a condition of her continued employment after sixty days.

Skuse continued to work for Pfizer for another thirteen months. Following a dispute between Pfizer management and Skuse as to whether she should be required to receive a particular vaccine, Pfizer terminated her employment.

Skuse filed this action against Pfizer and three of its employees, asserting claims based on the Law Against Discrimination, N.J.S.A. 10:5-1 to -49 (LAD). Pfizer moved to dismiss the complaint and compel arbitration. The trial court enforced Pfizer's Agreement, dismissed the complaint, and ordered the parties to arbitrate Skuse's claims.

3

The Appellate Division reversed the trial court's determination. It held that Pfizer's communications to Skuse regarding the Agreement were inadequate to ensure that she knowingly and unmistakably agreed to arbitrate her claims and waive her right of access to the courts. Skuse v. Pfizer Inc., 457 N.J. Super. 539, 561 (App. Div. 2019). The Appellate Division identified three aspects of Pfizer's communications to Skuse as grounds for its decision: Pfizer's use of e-mails to disseminate the Agreement to employees already inundated with e-mails; its use of a "training module" or a training "activity" to explain the Agreement; and its instruction that Skuse click her computer screen to "acknowledge" her obligation to assent to the Agreement in the event that she remained employed for sixty days, not to "agree" to the Agreement. Id. at 555-61.

We conclude that Pfizer's Agreement and related communications informed Skuse that if she remained a Pfizer employee more than sixty days from her receipt of that Agreement, she was deemed to assent to it. We hold that those communications clearly and unmistakably explained the rights that Skuse would waive by agreeing to arbitration, thus complying with our waiver-of-rights case law. We further determine that Pfizer's delivery of the Agreement by e-mail did not warrant its invalidation. We view Pfizer's use of the word "acknowledge" -- in its request that Skuse click to "acknowledge"

4

her obligation to arbitrate disputes with her employer if she remained a Pfizer employee sixty days later -- to be appropriate in the circumstances of this case, given the terms of Pfizer's arbitration policy and other expressions of assent that immediately preceded that request. We concur with the Appellate Division that Pfizer should not have labeled its communication explaining its arbitration agreement a "training module" or training "activity," but we do not view that as a basis to invalidate the Agreement.

Accordingly, we reverse the Appellate Division's determination and reinstate the trial court's judgment dismissing the complaint and ordering arbitration.

I.

A.

On May 5, 2016, Pfizer's Human Resources Department sent an e-mail to Pfizer employees at their corporate e-mail addresses.[1] The e-mail announced Pfizer's five-page Agreement and included a link to that document.

The first section of the Agreement, entitled "Mutual Arbitration Agreement," provided:

---

[1] We derive our summary of the facts from the allegations of the complaint and the record presented to the trial court in connection with Pfizer's motion to dismiss and to compel arbitration.

5

Except as expressly set forth in section 3, titled, "Claims Not Covered by this Agreement," all disputes, claims, complaints, or controversies ("Claims") that you have now or at any time in the future may have against Pfizer and/or any of its parents, subsidiaries, affiliates, predecessors, successors, assigns, current and former officers, directors, employees, and/or those acting as an agent of the Company (which make up the definition of "Company"), or that the Company has now or at any time in the future may have against you, including claims relating to breach of contract, tort claims, wrongful discharge, discrimination and/or harassment claims, retaliation claims, claims for overtime, wages, leaves, paid time off, sick days, compensation, penalties or restitution, including but not limited to claims under the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other claim under any federal, state, or local statute, constitution, regulation, rule, ordinance, or common law, arising out of and/or directly or indirectly related to your application for employment with the Company, and/or your employment with the Company, and/or termination of your employment with the Company (collectively "Covered Claims"), are subject to arbitration pursuant to the terms of this Agreement and will be resolved by arbitration and NOT by a court or jury. THE PARTIES HEREBY FOREVER WAIVE AND GIVE UP THE RIGHT TO HAVE A JUDGE OR JURY DECIDE ANY COVERED CLAIMS. Either party to this Agreement may make application to a court for temporary or preliminary injunctive relief in aid of arbitration or for

6

the maintenance of the status quo pending arbitration, if the award to which the party may be entitled may be rendered ineffectual without such relief.

The following language appeared in bold font on the final page of the Agreement:

> You understand that your acknowledgement of this Agreement is not required for the Agreement to be enforced. If you begin or continue working for the Company sixty (60) days after receipt of this Agreement, even without acknowledging this Agreement, this Agreement will be effective, and you will be deemed to have consented to, ratified and accepted this Agreement through your acceptance of and/or continued employment with the Company.

The May 5, 2016 e-mail stated that under the Agreement, "both colleagues and Pfizer agree that arbitration will replace state and federal courts as the place where certain employment disputes are ultimately decided," and that "arbitrators will resolve the disputes, rather than judges or juries." It also included a link to a document entitled "Mutual Arbitration and Class Waiver Agreement FAQs," which listed "Frequently Asked Questions," including:

> 4. Do I have to agree to this?
>
> The Arbitration Agreement is a condition of continued employment with the Company. If you begin or continue working for the Company sixty (60) days after receipt of this Agreement, it will be a contractual agreement that binds both you and the Company.

7

5. Can I change any parts of the agreement that I do not like?

No, you cannot change any of the terms of the Arbitration Agreement.

6. Do I give up any rights under the Arbitration Agreement?

Please review the Arbitration Agreement carefully to fully understand its terms and conditions. By agreeing to the Arbitration Agreement through continuing your employment with Pfizer, you are giving up the right to bring employment-related claims covered by the Agreement against Pfizer in a court of law. Instead, you are agreeing to arbitrate those claims before a neutral arbitrator. You are also agreeing to bring those claims on an individual basis and not on a class action, collective action, or representative action basis. Pfizer is also giving up the right to bring employment-related claims covered by the Agreement against you in court and is agreeing to bring any such claims on an individual basis in arbitration.

The "FAQs" document informed employees that Pfizer "cannot provide you with legal advice about the legal impact" of the Agreement. It stated that Pfizer encouraged any employee who had "legal questions" about the Agreement "to speak to [his or her] own attorney." The "FAQs" document also explained the details of the arbitration proceedings contemplated by the Agreement.

On May 5 and 6, 2016, as part of Pfizer's "Power2Learn" module-based training program, Pfizer sent a second e-mail to approximately 28,540 Pfizer employees at their Pfizer e-mail addresses. In that e-mail, Pfizer advised each employee that he or she had been "assigned the activity, Mutual Arbitration and Class Waiver Agreement and Acknowledgment." The e-mail stated that the employee had been assigned the training "activity" because "[a]s a condition of your employment with Pfizer, you and Pfizer agree to individual arbitration as the exclusive means of resolving certain disputes relating to your employment." The e-mail added "[t]his agreement is contained in the Mutual Arbitration and Class Waiver Agreement. It is important that you are aware of the terms of this Agreement."

In its second e-mail, Pfizer informed the employees that the due date for completing the "activity" was July 4, 2016, the date on which the Agreement would become effective.

The e-mail included a link by which the employee would launch the "Mutual Arbitration and Class Waiver Agreement" module, choose to proceed in English or Spanish, and review the module.

The module consisted of four slides. The first slide stated:

> As a condition of your employment with Pfizer, you and Pfizer agree to individual arbitration as the exclusive means of resolving certain disputes relating to your employment. This agreement is contained in

9

the Mutual Arbitration and Class Waiver Agreement. It is important that you are aware of the terms of this Agreement.

The next page contains the Mutual Arbitration and Class Waiver Agreement. You will be able to review and print the Agreement. You will then be asked to acknowledge your receipt of the Agreement.

The second slide instructed the employee to "[c]lick the 'Resources' tab in the upper-right corner to review the Agreement" and identified that tab with an arrow. The slide instructed that after opening the "Resources" tab, the employee "may print the Agreement and retain for your records." It instructed that after reviewing the Agreement, the employee should "close the window to return to this page."

The third slide stated:

I understand that I must agree to the Mutual Arbitration and Class Waiver Agreement as a condition of my employment. Even if I do not click here, if I begin or continue working for the Company sixty (60) days after receipt of this Agreement, even without acknowledging this Agreement, this Agreement will be effective, and I will be deemed to have consented to, ratified and accepted this Agreement through my acceptance of and/or continued employment with the Company.

Just below the language set forth above, a box with an arrow pointing upward to that language instructed the employee to "CLICK HERE to acknowledge."

10

The fourth slide thanked the employee "for reviewing the Mutual Arbitration and Class Waiver Agreement." It provided an e-mail address for the employee to use if he or she had questions about the Agreement and instructed the employee to "[c]lick 'Exit' to exit this course."

B.

In 2012, Pfizer hired Skuse to work as a flight attendant in its corporate aviation operations, based at its aviation facility in West Trenton.

Skuse was an active Pfizer employee on May 5 and 6, 2016, when Pfizer sent its two e-mails to employees announcing its arbitration Agreement. Pfizer's records indicate that Skuse received both e-mails. On June 9, 2016, Pfizer sent Skuse an e-mail confirming that she had completed the Mutual Arbitration and Class Waiver Agreement training module at 7:33 p.m. on that date.

The dispute that gave rise to this action concerned Pfizer's policy requiring its corporate aviation flight attendants to be vaccinated for yellow fever. Skuse, a practicing Buddhist who has adhered to a vegan diet all her adult life, refused the yellow fever vaccine on the ground that it contained animal products. She states that during the first five years of her employment at Pfizer, she was never asked or pressured to be vaccinated for yellow fever.

11

According to Skuse, in April 2017, the two managers to whom she reported gave her "an ultimatum to receive the yellow fever vaccination" within thirty days "or be terminated." She asserts that her managers ignored a letter from her doctor and her requests for exemptions from the vaccination requirement on religious and medical grounds, and that they persistently pressured her to be vaccinated or be terminated, prompting her to have a "breakdown from all of the threats."

Skuse contends that she was granted medical leave but was not permitted to return to work at the conclusion of that leave, and that Pfizer refused to reasonably accommodate her request to be exempted from the vaccination requirement.

On August 11, 2017, Pfizer terminated Skuse's employment.

## II.

## A.

Skuse filed a complaint against Pfizer, the two managers to whom she reported and a Pfizer human resources executive. Skuse alleged that Pfizer and the individual defendants violated the LAD by terminating her employment because of her religious objection to being vaccinated for yellow fever. She demanded compensatory and punitive damages, attorneys' fees, and other relief.

12

Invoking the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 to 16, and the New Jersey Arbitration Act (NJAA), N.J.S.A. 2A:23B-1 to -36, Pfizer and the individual defendants moved to dismiss the complaint and to compel arbitration.

Skuse opposed the motion, contending that she was not bound by Pfizer's Agreement. She asked the court to assume for purposes of the motion that she "got the email and that she saw the screen that said, I acknowledge receipt of this policy." Skuse argued, however, that in Pfizer's communications on May 5 and 6, 2016, she was asked only to acknowledge the Agreement, not to assent to it, and that she never agreed to arbitrate her claims.

Citing the FAA and the NJAA, the trial court granted the motion filed by Pfizer and the individual defendants. The court noted that it was undisputed that the Agreement covered Skuse's LAD claims and that, if the Agreement were held to be binding, the claims would be subject to arbitration. The trial court concluded that Skuse assented to the Mutual Arbitration and Class Waiver Agreement module by clicking the "acknowledge" box that appeared on the module's third slide. Citing <u>Jaworski v. Ernst & Young U.S. LLP</u>, 441 N.J. Super. 464 (App. Div. 2015), the court found that Skuse's continued employment after the effective date of Pfizer's arbitration policy constituted

13

assent to arbitration in accordance with Pfizer's Agreement. Accordingly, the trial court dismissed Skuse's complaint and directed her to proceed to arbitration in accordance with the Agreement.

B.

Skuse appealed the trial court's judgment. The Appellate Division granted amicus curiae status to the National Employment Lawyers Association of New Jersey, the Employers Association of New Jersey, and the New Jersey Civil Justice Institute. Skuse, 457 N.J. Super. at 551.

The Appellate Division observed that under United States Supreme Court jurisprudence applying the FAA, state-law contract principles govern contract formation in a dispute over the arbitrability of a claim. Id. at 552 (citing AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011)). The court recognized Leodori v. CIGNA Corp., 175 N.J. 293 (2003), as the state law "guiding precedent" on mutual assent and knowing and voluntary waiver of rights in arbitration agreements between employers and employees. Id. at 552-53.

The Appellate Division noted a distinction between Leodori, in which the employer sought but did not obtain the employee's physical signature on an "agreement" form, and this matter, in which the employer used a computer training module "to communicate and impose the terms of its mandatory

14

arbitration policy." Id. at 555. It concluded, however, that like the arbitration agreement in Leodori, the arbitration agreement in this case was not agreed to and was thus unenforceable. Id. at 555-61. The Appellate Division viewed "the wording and method of Pfizer's training module" to be "inadequate to substantiate an employee's knowing and unmistakable assent to arbitrate and waive his or her rights of access to the courts." Id. at 561. It therefore reversed the trial court's judgment. Ibid.

C.

We granted Pfizer's petition for certification. 238 N.J. 374 (2019). We also granted amicus curiae status to the New Jersey Association for Justice, the New Jersey Business & Industry Association, the Commerce and Industry Association of New Jersey, the New Jersey Chamber of Commerce, and the Chamber of Commerce of the United States of America. The National Employment Lawyers Association of New Jersey, the Employers Association of New Jersey, and the New Jersey Civil Justice Institute continue to participate as amici curiae.

III.

A.

Pfizer and the individual defendants argue that the trial court properly enforced a valid and binding arbitration agreement between it and its

employee, Skuse. They cite Pfizer's announcement of its arbitration policy in its May 5 and 6, 2016 e-mails, which provided a link to that Agreement. Pfizer and the individual defendants assert that when Skuse "acknowledged" the Agreement, she agreed to be bound by that Agreement, and that even if Skuse's completion of the module was not sufficient to bind her to the Agreement's terms, her continued employment for thirteen months thereafter unambiguously effected a waiver of her rights. They argue that any heightened standard imposed by New Jersey law for the waiver of rights in the employment arbitration setting would diverge from the requirements imposed by state law on other types of contracts, thus contravening the FAA as applied in <u>Kindred Nursing Centers Ltd. Partnership v. Clark</u>, 581 U.S.___, 137 S. Ct. 1421 (2017).

### B.

Skuse contends that the Appellate Division properly reversed the trial court's determination. She states that New Jersey case law treats arbitration contracts as it treats any other contract and that, accordingly, this appeal does not implicate <u>Kindred Nursing</u>. Skuse argues that Pfizer did not ask her to "agree" to the Agreement, but only to acknowledge that she received the Agreement. To Skuse, that acknowledgement does not satisfy the standard prescribed by this Court in <u>Leodori</u>.

16

Skuse asserts that Pfizer's notice to her that she would be "deemed to have consented to, ratified and accepted this Agreement through [her] acceptance of and/or continued employment with the Company" was likewise inadequate to express her individual assent to that Agreement. She urges that we hold that in the absence of an unambiguous agreement to arbitration, it is her subjective intent, not her assumed intent, that governs.

C.

Amici curiae New Jersey Business & Industry Association, Commerce and Industry Association of New Jersey, New Jersey Chamber of Commerce, Chamber of Commerce of the United States of America, Employers Association of New Jersey, and the New Jersey Civil Justice Institute urge that we reverse the Appellate Division's judgment. Amici assert that to the extent that state law would impose a more exacting test for assent in an arbitration dispute than it does in other contractual settings, it would run afoul of the FAA and the Supreme Court's decision in Kindred Nursing. Amici contend that under state contract law principles, Skuse assented to Pfizer's Agreement when she clicked the box "acknowledging" her agreement and elected to remain employed after the effective date of Pfizer's arbitration policy.

17

D.

Amici curiae National Employment Lawyers Association of New Jersey and New Jersey Association for Justice argue that the Appellate Division decision should be affirmed. Amici assert that Pfizer failed to demonstrate Skuse's assent to its Agreement because she did nothing more than receive and acknowledge that Agreement. They contend that the communications between Pfizer and Skuse do not satisfy the contractual formation principles applied to all agreements under New Jersey law.

IV.

A.

"Whether a contractual arbitration provision is enforceable is a question of law, and we need not defer to the interpretative analysis of the trial or appellate courts unless we find it persuasive." Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 316 (2019). We review de novo the trial court's determination that Skuse's claims are subject to arbitration. See ibid.; Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 445-46 (2014).

B.

The FAA and the NJAA "enunciate federal and state policies favoring arbitration." Atalese, 219 N.J. at 440; see also Concepcion, 563 U.S. at 339, 346 (noting section 2 of the FAA reflects "a liberal federal policy favoring

18

arbitration" and "the fundamental principle that arbitration is a matter of contract" (internal quotation marks and citations omitted)); Martindale v. Sandvik, Inc., 173 N.J. 76, 92 (2002) (recognizing "the affirmative policy of this State, both legislative and judicial, favors arbitration as a mechanism for resolving disputes").

Pursuant to the FAA, courts must "place arbitration agreements 'on equal footing with all other contracts.'" Kindred Nursing, 137 S. Ct. at 1424 (quoting DIRECTV, Inc. v. Imburgia, 577 U.S. ___, 136 S. Ct. 463, 468 (2015)); see also Arafa v. Health Express Corp., ___ N.J. ___, ___ (2020) (slip op. at 18) (noting in the FAA, "Congress intended to place arbitration agreements upon the same footing as other contracts" (internal quotation marks omitted) (quoting Goffe v. Foulke Mgmt. Corp., 238 N.J. 191, 208 (2019)). Thus, a state may not "subject an arbitration agreement to more burdensome requirements than those governing the formation of other contracts." Leodori, 175 N.J. at 302. "An arbitration clause cannot be invalidated by state-law 'defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" Atalese, 219 N.J. at 441 (quoting Concepcion, 563 U.S. at 339).

Notwithstanding the FAA's preemptive effect, federal law "specifically permits states to regulate contracts, including contracts containing arbitration

19

agreements under general contract principles." Martindale, 173 N.J. at 85.

New Jersey may "regulate agreements, including those that relate to

arbitration, by applying its contract-law principles that are relevant in a given

case." Leodori, 175 N.J. at 302. Accordingly, we look to state-law principles

generally applicable to contracts involving the waiver of rights as the

governing law in this appeal. Atalese, 219 N.J. at 441.

## V.

## A.

Guided by contract principles stated in our case law, we determine

whether Skuse assented to the arbitration of her LAD claims.

In that inquiry, we first determine whether the terms of the Agreement

itself and the language appearing in Pfizer's explanatory materials satisfy New

Jersey's state law standard governing contractual waiver of rights. We next

consider whether the Appellate Division correctly concluded that the

Agreement was unenforceable because Pfizer chose "an inadequate way for an

employer to go about extracting its employees' agreement" to arbitrate. Skuse,

457 N.J. Super. at 542.

B.

1.

An arbitration agreement must be the result of the parties' mutual assent, according to customary principles of state contract law. Atalese, 219 N.J. at 442. Thus, "there must be a meeting of the minds for an agreement to exist before enforcement is considered." Kernahan, 236 N.J. at 319.

For any waiver-of-rights provision to be effective, the party who gives up rights must "have full knowledge of his legal rights and intent to surrender those rights." Knorr v. Smeal, 178 N.J. 169, 177 (2003). When the waiver of rights is an agreement to arbitrate employment disputes, courts "require[] some concrete manifestation of the employee's intent as reflected in the text of the agreement itself." Leodori, 175 N.J. at 300 (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 135 (2001)). "Our jurisprudence has stressed that when a contract contains a waiver of rights -- whether in an arbitration or other clause -- the waiver 'must be clearly and unmistakably established.'" Atalese, 219 N.J. at 444 (quoting Garfinkel, 168 N.J. at 132).

In Atalese, we invalidated an arbitration clause in a consumer contract that did not explain to the consumer that by signing the agreement, she waived

her right to pursue her statutory claims in court.  Id. at 445-48.  We observed

that

> [n]owhere in the arbitration clause is there any explanation that plaintiff is waiving her right to seek relief in court for a breach of her statutory rights. . . . The provision does not explain what arbitration is, nor does it indicate how arbitration is different from a proceeding in a court of law.  Nor is it written in plain language that would be clear and understandable to the average consumer that she is waiving statutory rights. The clause here has none of the language our courts have found satisfactory in upholding arbitration provisions -- clear and unambiguous language that the plaintiff is waiving her right to sue or go to court to secure relief.
>
> [Id. at 446.]

Emphasizing "that no prescribed set of words must be included in an arbitration clause to accomplish a waiver of rights," we held that an arbitration clause, "at least in some general and sufficiently broad way, must explain that the plaintiff is giving up her right to bring her claims in court or have a jury resolve the dispute."  Id. at 447.

In Kernahan, we reviewed a provision in a consumer contract entitled "Mediation" that addressed two different methods of alternative dispute resolution -- arbitration and mediation -- in a contradictory and confusing manner and identified the American Arbitration Association's Commercial

22

Mediation Rules as the exclusive method of resolving the parties' disputes. 236 N.J. at 323-26. We held that the provision's "references to arbitration cannot be harmonized with the title of the section and the intended use of the Commercial Mediation Rules in order to give rise to an enforceable agreement to arbitrate," and that its "small typeface, confusing sentence order, and misleading caption exacerbate the lack of clarity in expression." Id. at 326. Given the "material discrepancies that call[ed] into question the essential terms of the purported agreement to arbitrate," we found that there was no mutual assent and declined to compel arbitration. Id. at 327.

Our case law thus requires that a waiver-of-rights provision be written clearly and unambiguously. Atalese, 219 N.J. at 443; Leodori, 175 N.J. at 302. In an employment setting, employees must "at least know that they have 'agree[d] to arbitrate all statutory claims arising out of the employment relationship or its termination.'" Atalese, 219 N.J. at 447 (alteration in original) (quoting Garfinkel, 168 N.J. at 135).

### 2.

Applying those principles, we conclude that Pfizer's Agreement and its related communications clearly informed Skuse that by continuing to be employed for sixty days, she would waive her right to pursue employment discrimination claims against Pfizer in court. The Agreement, the e-mails, the

"FAQs" document, and the module explained that an employee would assent to arbitration of covered disputes by virtue of his or her continued employment for sixty days.

New Jersey contract law recognizes that in certain circumstances, conduct can constitute contractual assent.  See, e.g., Martindale, 173 N.J. at 88-89 ("[I]n New Jersey, continued employment has been found to constitute sufficient consideration to support certain employment-related agreements."); Weichert Co. Realtors v. Ryan, 128 N.J. 427, 436 (1992) ("An offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact.").  Indeed, in Jaworski, the Appellate Division enforced the employer's agreement providing that an employee "indicates his or her agreement to the Program [mandating arbitration] and is bound by its terms and conditions by beginning or continuing employment" after a specific date.  441 N.J. Super. at 474-75.

Pfizer unambiguously explained that an employee's continued employment after the arbitration policy's effective date would be deemed to constitute his or her assent to the arbitration policy.  The Agreement stated, in bold font, that the employee's acknowledgement of the Agreement was not required for that Agreement to be enforced, and that the employee would be

24

"deemed to have consented to, ratified and accepted this Agreement" by accepting or continuing employment with Pfizer after the effective date.

That message was underscored by Pfizer's additional communications. The May 5, 2016 e-mail explained that "[a]ll covered colleagues will be bound by the agreement as part of their continued employment at Pfizer." The "FAQs" page linked to that e-mail provided that "[t]he [a]rbitration [a]greement is a condition of continued employment with the Company. If you begin or continue working for the Company sixty (60) days after receipt of this Agreement, it will be a contractual agreement that binds both you and the Company." In addition, the first of the four slides comprising the module stated that "[a]s a condition of [the employee's] employment with Pfizer," the employee agreed to "individual arbitration as the exclusive means of resolving certain disputes relating to your employment."

Pfizer thus informed employees, with the clarity that our waiver-of-rights law requires, that continued employment after the policy's effective date would constitute acceptance of the Agreement's terms. It advised Skuse that if she remained employed by Pfizer after July 4, 2016, her conduct would constitute assent to arbitration in accordance with the Agreement's terms. She had the option to leave her employment if it was unacceptable to her that most

25

potential disputes between her and Pfizer would be arbitrated rather than resolved by a jury or judge.

Pfizer's communications comported with our waiver-of-rights law in a second critical respect. As our decisions in Atalese and Kernahan require, Pfizer clearly explained to Skuse the rights that she would relinquish if she remained employed after the policy's effective date and thereby assented to the Agreement's terms. The Agreement provided that the claims affected would be resolved by arbitration, not "by a court or jury," and -- in capital letters -- that the parties "forever waive and give up the right to have a judge or a jury decide any covered claims." Pfizer's May 5, 2016 e-mail stated that under the Agreement, "arbitration will replace state and federal courts as the place where certain employment disputes are ultimately decided," and that arbitrators, "rather than judges or juries," would resolve the disputes. The Agreement's language complied with our mandate in Atalese that a waiver-of-rights provision clearly and unambiguously state that the plaintiff is "waiving her right to sue or go to court to secure relief." 219 N.J. at 446.

Pfizer's communications also explained in general terms what arbitration, the agreed-upon method of dispute resolution, would entail, with no confusing references to mediation as in Kernahan. Its Agreement, summarized on the "FAQs" page, briefly described an arbitration proceeding,

26

defined the arbitrator's role, explained the effect of an arbitrator's decision, identified a specific arbitration organization as the administrator of its program, and designated that organization's employment arbitration rules as the governing rules for the proceeding. Those communications informed Skuse "that there is a distinction between resolving a dispute in arbitration and in a judicial forum," Atalese, 219 N.J. at 445, and made clear that if she assented, arbitration would be "the only means of dispute resolution permitted" to her, see Kernahan, 236 N.J. at 325-26.

Finally, Skuse's LAD claim was indisputably included in the Agreement's broad language describing the employment-related claims subject to arbitration, and it does not fall within the exceptions to that policy enumerated in the Agreement.

In sum, the terms of the Agreement, supported by the explanatory documents that accompanied it, met the standard of clarity that our decisions impose in all respects. Those communications informed Skuse that by remaining employed at Pfizer, she would give up the right to pursue her LAD claims in court and would instead be required to submit those claims to arbitration as described in the Agreement. And the Agreement and Pfizer's other communications left no question that Skuse's continued employment would be deemed to constitute her assent, thus ensuring that her potential

27

employment discrimination claims against her employer would be resolved by arbitration.

C.

We next consider the method by which Pfizer chose to deliver its Agreement and accompanying communications to Skuse.

The Appellate Division premised its reversal of the trial court's decision on three aspects of Pfizer's communications with Skuse:  its use of e-mail to convey important information to employees overwhelmed by too many workplace e-mails, Skuse, 457 N.J. Super. at 555-57; its labeling of its slides summarizing the Agreement as a "training module" or training "activity," id. at 557; and its choice of the term "acknowledge," rather than the term "agree" in the "click box" at the presentation's end, id. at 558-59.  We consider each in turn.

1.

The Appellate Division observed that employees who work in offices are "inundated" with incoming e-mails and that they "send out a large number of their own e-mails."  Id. at 556.  The court took judicial notice that in order to deal with the volume of e-mails that they receive, "people frequently skim (or scroll through without reading) written material sent to them digitally," such as

28

computer applications downloaded online, or "impersonal messages or announcements from organizations." Ibid.

The Appellate Division held that the terms used in Pfizer's e-mails in "assigning" the "training module" actually "dilute[d] the legal significance and necessary mutuality of the contractual process." Id. at 557. It expressed doubt that all Pfizer employees took the time to read the Agreement linked to the module. Id. at 558. It viewed Pfizer's use of e-mail as a factor warranting invalidation of the Agreement. Id. at 555-58.

We concur with the Appellate Division that many of our State's residents receive large volumes of e-mails in the workplace, and that it is not always feasible for a given employee to scroll through and carefully read each of the e-mails that he or she receives. We do not share the Appellate Division's view, however, that this indisputable challenge faced by many workers invalidates the Agreement. See ibid.

Even if Skuse were to contend that she did not review Pfizer's May 5 and 6, 2016 e-mails and their attachments because of the volume of e-mails addressed to her -- which she does not -- her failure to review Pfizer's communications would not invalidate the Agreement. As the Appellate Division has observed, "[a]s a general rule, 'one who does not choose to read a contract before signing it cannot later relieve himself of its burdens.' The onus

29

was on plaintiff to obtain a copy of the contract in a timely manner to ascertain what rights it waived by beginning the arbitration process." Riverside Chiropractic Grp. v. Mercury Ins. Co., 404 N.J. Super. 228, 238 (App. Div. 2008) (quoting Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 386 (1960)); see also Goffe, 238 N.J. at 212 ("[T]he argument that [a] plaintiff did not understand the import of the arbitration agreement and did not have it explained to her by the dealership is simply inadequate to avoid enforcement of [the] clear and conspicuous arbitration agreement[] [she] signed."). Any contention by Skuse that she completed Pfizer's e-mailed module without reading its contents or the documents linked to it would have no impact on the analysis. See Henningsen, 32 N.J. at 386.

Moreover, no principle of New Jersey contract law bars enforcement of a contract because that contract is communicated by e-mail, rather than by the transfer of a hard-copy document. If we were to adopt such a rule, it would invalidate contracts that have been negotiated and transmitted electronically for decades. We decline to do so here.

Indeed, our contract law recognizes that an electronic communication may be a clear and effective method of communicating proposed contract terms. Rejecting the contention that an online agreement containing a forum selection clause should be viewed differently from a forum selection clause on

30

a cruise ticket that the United States Supreme Court had upheld, the Appellate

Division observed that

> [t]he scenario presented here is different because of the medium used, electronic versus printed; but, in any sense that matters, there is no significant distinction. The plaintiffs in [Carnival Cruise Lines v. Shute, 499 U.S. 585 (1991)] could have perused all the fine-print provisions of their travel contract if they wished before accepting the terms by purchasing their cruise ticket. The plaintiffs in this case were free to scroll through the various computer screens that presented the terms of their contracts before clicking their agreement.
>
> [Caspi v. Microsoft Network, L.L.C., 323 N.J. Super. 118, 125 (App. Div. 1999)].

As the Appellate Division there noted, "[w]e discern nothing about the

style or mode of presentation, or the placement of the provision, that can be

taken as a basis for concluding that the forum selection clause was proffered

unfairly, or with a design to conceal or de-emphasize its provisions." Id. at

125-26.  It accordingly enforced the disputed clause.[2]  Ibid.  But see Hoffman

---

[2]  Contracts that require "that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction" are sometimes called "clickwrap" agreements.  Feldman v. Google, Inc., 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007).  "Even though they are electronic, clickwrap agreements are considered to be writings because they are printable and storable."  Ibid.  Such agreements are "routinely enforced by the courts."  HealthPlanCRM, LLC v. AvMed, Inc., ___ F. Supp. 3d ___, ___ (W.D. Pa. 2020) (slip op. at 38); see Meyer v. Uber Techs., Inc., 868 F.3d 66, 75 (2d Cir. 2017) (clickwrap agreements are valid and routinely enforced); Hancock v. AT&T Co., Inc., 701 F.3d. 1248, 1258 (10th Cir. 2012)

v. Supplements Togo Mgmt., LLC, 419 N.J. Super. 596, 611 (App. Div. 2011) (holding the disputed forum selection clause presumptively unenforceable because it was concealed from offeree in "a submerged portion of the webpage" and was not clearly presented, in contrast to the provision in Caspi).

As in Caspi, and in contrast to Hoffman, nothing in the e-mailed communications in this case concealed the Agreement or understated its importance. To the contrary, Pfizer highlighted that Agreement in two e-mails to the employees concerned. Each e-mail provided a conspicuous link to the Agreement itself. The first prominently announced and explained Pfizer's new arbitration policy and linked to the "FAQs" page discussing the import of the Agreement and suggesting that an employee might seek to review it with counsel. The second launched the module summarizing the Agreement. Moreover, contrary to the Appellate Division's suggestion that an employee could easily miss the Agreement because it was sent by e-mail, these communications could not be ignored because every employee was required to

(same); Feldman, 513 F. Supp. 2d at 235-38 (enforcing clickwrap agreement); Specht v. Netscape Commc'ns Corp., 150 F. Supp. 2d 585, 594-95 (S.D.N.Y. 2001) (finding that "[t]he few courts that have had occasion to consider click-wrap contracts have held them to be valid and enforceable," but invalidating the agreement at issue because "the user [did not] need [to] view any license agreement terms or even any reference to a license agreement, and [did not] need [to] do anything to manifest assent to such a license agreement other than actually taking possession of the product."), aff'd, 306 F.3d 17 (2d Cir. 2002).

32

access and complete the module by a stated deadline. Pfizer presented its new arbitration policy as an important development and emphasized its consequences.

Accordingly, we do not share the Appellate Division's view that Pfizer's decision to communicate the Agreement and related materials to its employees by e-mail warrants invalidation of the Agreement.

2.

The Appellate Division viewed Pfizer's description of its four-slide summary of the Agreement as a "training module" and "activity" in its training program to be misleading. Skuse, 457 N.J. Super. at 559. We agree that Pfizer's characterization of its slides summarizing the Agreement as "training" was a misnomer.

When an employer instructs an employee about an aspect of his or her job or mandates that an employee review and agree to abide by the policies that it expects the employee to honor in the workplace, it is "training" the employee. When an employer informs an employee that it has adopted an arbitration policy and that his or her continued employment will constitute assent to arbitrate potential disputes, "training" is not the most accurate word to describe what transpires.

When it disseminates an arbitration agreement, an employer may choose to use tools developed for its training program, such as e-mail notice to employees, mandatory review of an agreement along with other relevant documents within a prescribed period, and digital confirmation that the employee has reviewed the materials provided. Those techniques may highlight the importance of the arbitration materials to the employee and ensure that the communications were received and reviewed. The employer should not, however, label those communications as "training."

In our view, however, Pfizer's use of the term "training" in its communications does not invalidate the Agreement. By virtue of their content and tone, Pfizer's communications could not be misconstrued as a routine component of a training program. In its May 5 and 6, 2016 e-mails and their attachments, Pfizer signaled a fundamental change in the manner in which potential disputes would be resolved. Pfizer plainly informed employees that they needed to understand and act on the new policy, and that they should seek the advice of counsel if they had legal questions about it. Although a reference to "training" in an employer's communication of an arbitration policy might be regarded as misleading an employee in a different setting, Pfizer's use of the term does not invalidate the Agreement in the circumstances here.

34

3.

Finally, the Appellate Division held that because Pfizer requested that Skuse "CLICK HERE to acknowledge" at the end of its module, instead of asking that she click to "agree," she did not assent to the Agreement's terms. Id. at 558-61. Relying on this Court's decision in Leodori, the Appellate Division deemed it "vital that this momentous segment of the module make 'unmistakably' clear that the employee is voluntarily agreeing to the arbitration policy, and not simply acknowledging it." Id. at 559.

In Leodori, we considered an employer's decision to require each employee to sign a specific form as an expression of his or her intent to agree to the employer's arbitration policy. 175 N.J. at 303-07. There, the employer issued to all employees a handbook that set forth the company's arbitration policy and identified that policy as "a term and condition of [the employee's] continued employment." Id. at 296. It issued two separate forms with its handbook: an "acknowledgement" form that included a space for the employee to acknowledge that he or she had received the handbook but included no details on the arbitration policy, and a form entitled "Employee Handbook Receipt and Agreement," to be signed by the employee, stating that any claims other than worker's compensation or unemployment compensation claims would be subject to arbitration. Id. at 297-98. The plaintiff signed the

35

"acknowledgment" form but declined to sign the "Receipt and Agreement" form; on the latter, "[t]he signature line in [the] plaintiff's copy was left blank." Id. at 298.

We held that because the plaintiff did not sign the "Receipt and Agreement" form, he did not assent to arbitration. Id. at 305. We observed that

> the acknowledgment form that plaintiff did sign would have sufficed as concrete proof of a waiver had it stated that the employee had agreed to the more detailed arbitration provision contained in the handbook. (The acknowledgment form states only that plaintiff had "received" the handbook, not that he had "agreed" to its terms.) We assume that even large employers presently require their employees to sign similar forms as a routine part of the handbook-distribution process. Thus, with minimal effort, employers can revise the language to include an indication that the recipient has received and agreed to an arbitration policy. The acknowledgment form need not recite that policy verbatim so long as the form refers specifically to arbitration in a manner indicating an employee's assent, and the policy is described more fully in an accompanying handbook or in another document known to the employee.
>
> [Id. at 307.]

The communications at issue in this case differ fundamentally from those at issue in Leodori.

First, the employer in <u>Leodori</u> designated the employee's signature on the "Employee Handbook Receipt and Agreement" form -- not his signature on the "acknowledgement" form or any other conduct -- as the method by which the employee would assent to the arbitration agreement. <u>Id.</u> at 305-06. We cited <u>Restatement (Second) of Contracts</u> § 60 (Am. Law Inst. 1981), which provides that "[i]f an offer prescribes the place, time or manner of acceptance[,] its terms in this respect must be complied with in order to create a contract." <u>See</u> <u>id.</u> at 306. Based on that provision, we held that "[o]ur contract law does not permit defendant to contemplate or require plaintiff's signature on an agreement and then successfully to assert that the omission of that signature is irrelevant to the agreement's validity." <u>Ibid.</u> As we noted, the employer's "own documents contemplated plaintiff's signature as a concrete manifestation of his assent." <u>Ibid.</u> We concluded that "[a]bsent plaintiff's signature here, we cannot enforce the waiver provision unless we find some other unmistakable indication that the employee affirmatively had agreed to arbitrate his claims." <u>Id.</u> at 307.

This appeal raises no such considerations. No form intended to confirm the employee's assent was left unsigned, as was the case with the plaintiff's "Review and Agreement" form in <u>Leodori</u>. No writing -- paper or digital -- was designated by the employer to be the employee's expression of assent, let

37

alone refused by Skuse.  Instead, the prescribed form of assent here was the employee's decision to remain employed after the effective date of the arbitration policy.  As the Appellate Division observed in Jaworski,

> [h]ere, unlike Leodori, where the employer's "own documents contemplated [the employee's] signature as a concrete manifestation of assent," [the employer's] ADR policy provided:  "An Employee indicates his or her agreement to the Program and is bound by its terms and conditions by beginning or continuing employment with [the employer] after July 18, 2007 (the 'Effective Date')."  Not only did [the employee] continue with [the employer] after the Effective Date, thus manifesting his intent to be bound pursuant to the unambiguous and specifically [] emphasized terms of the Program, he did so for an additional five years until his termination in 2012.
>
> [Jaworski, 441 N.J. Super. at 474 (second alteration in original) (emphasis and citation omitted).]

Here, as in Jaworski, the employee assented to the Agreement in accordance with Pfizer's designated method of expressing assent -- her continued employment for an additional sixty days after she received the Agreement.

Second, there are stark distinctions between the "acknowledgement" form signed by the plaintiff in Leodori and the page containing the "CLICK HERE to acknowledge" button in Pfizer's arbitration module.

38

In Leodori, the "acknowledgement" form only generally mentioned the employee handbook and did not "refer specifically to arbitration"; only the "Receipt and Agreement" form that the plaintiff refused to sign specifically addressed arbitration. Leodori, 175 N.J. at 295-97. Moreover, the "acknowledgement" form made no reference to any agreement. Id. at 297. It confirmed only that the employee had "received a copy" of the employee handbook; that he understood that the handbook included "information on division policies and programs" that he was "responsible for knowing"; and that he understood that the policies and programs were "subject to change at the discretion of senior management and that the handbook and its contents are not a contract of employment." Ibid. On its face, the form was thus untethered to the question of arbitration. Ibid.

Pfizer's use of the word "acknowledge" on the third page of the module, in contrast, was plainly tied to the arbitration provision at issue.[3] That page was entitled "Mutual Arbitration and Class Waiver Agreement and Acknowledgement," and the Agreement's full title was also mentioned on the first line of that page. It is evident from the language of that page that the

_____

[3] The module's first slide, previewing the slides that followed, imprecisely stated that the employee would be asked to "acknowledge [his or her] receipt" of the Mutual Arbitration and Class Waiver Agreement. As the third slide makes clear, the acknowledgement that appears on that slide entails much more than the employee's mere "receipt" of the Agreement.

"CLICK HERE to acknowledge" button directly relates to Pfizer's arbitration policy, as set forth in that Agreement.

Significantly, the language immediately preceding "CLICK HERE to acknowledge" used several other terms that denote assent. What Skuse was asked to "acknowledge" -- what she did "acknowledge" -- was her understanding that she "must agree" to the Agreement, and that whether or not she clicked the "acknowledge" button, she would be deemed to have "consented to, ratified and accepted" the Agreement through her continued employment at Pfizer. As she clicked the "CLICK HERE to acknowledge" button, Skuse was reminded yet again that if she remained employed at Pfizer for an additional sixty days after receiving the Agreement, she would be deemed to have agreed to that Agreement's terms. Although the word "acknowledge" could be vague or misleading in a different setting, it was an appropriate term as used here.

## D.

In sum, Pfizer's Agreement explained to Skuse in clear and unmistakable terms the rights that she would forego if she assented to arbitration by remaining employed at Pfizer for sixty days. Although Pfizer's "training module" was not an optimal method of conveying to Skuse her employer's arbitration policy, Pfizer's May 5 and 6 e-mails, the link to the

40

Agreement contained in those e-mails, the "FAQs" page, and the summaries that appeared on the four pages collectively explained, with the clarity that our law requires, the terms of the Agreement to which Skuse agreed by virtue of her continued employment.

Accordingly, we hold that the Agreement was valid and binding, and we concur with the trial court's decision to enforce it.

## VI.

The judgment of the Appellate Division is reversed, and the trial court's judgment dismissing the complaint and ordering the parties to arbitrate their dispute is reinstated.

JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PATTERSON's opinion. JUSTICE ALBIN filed a concurrence. CHIEF JUSTICE RABNER filed a dissent. JUSTICE TIMPONE did not participate.

Amy Skuse,

Plaintiff-Respondent,

v.

Pfizer, Inc., John D. Witzig,
Paul Mangeot, and Connie Corbett,
individually, jointly, severally and/or
in the alternative,

Defendant-Appellants.

JUSTICE ALBIN, concurring.

I concur with the majority opinion because, despite any displeasure I may have with the online waiver-of-rights procedure used by the employer, the totality of the evidence persuades me that plaintiff clearly and unmistakably understood that she was agreeing to submit any disputed employment issue to an arbitrator rather than a court. In this appeal, plaintiff has not raised the argument that the arbitration provision in her employment agreement constituted an illicit, industry-wide contract of adhesion.[1]

---

[1] "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." See Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353 (1992).

1

The arbitration cases that have come before our Court have generally addressed whether employees or consumers had clearly and unmistakably waived their right to seek relief in a judicial forum for a breach of contract or a statutory violation. In that respect, this case is no different.

But soon employers and corporations will develop the perfect, unassailable arbitration clause. When every employment and consumer contract contains such a clause across an entire profession or industry, when employees and consumers have no choice but to waive their right to resolve their disputes in a judicial forum in order to get a job or buy a good, we will have to address a more profound question. Are such contracts of adhesion contrary to New Jersey's most fundamental public policy -- the constitutional right to a civil jury trial -- and therefore unconscionable and unenforceable under the Federal Arbitration Act and its state counterpart? That is the great issue that will confront the Court. I will not attempt to resolve that issue here, for this is not the time or the case. But I do want to set the stage for what is at stake.

I.

Alternative dispute resolution suggests a choice -- an alternative. When an entire industry or profession inserts in employment and consumer contracts arbitration provisions on a take-it-or-leave-it basis, the public has no real

2

choice. The option of rejecting an arbitration provision and foregoing either a job offer or access to medical services or the opportunity to purchase a car is not a choice. Most consumers who purchase goods and services and most job seekers who search for employment have no bargaining power to demand the removal of an arbitration clause. That is the reality of the marketplace.

## A.

The benefits of arbitration as an alternative dispute resolution forum are many, and when parties freely contract for arbitration, those agreements -- like all valid agreements -- must be enforced. Marchak v. Claridge Commons, Inc., 134 N.J. 275, 281-82 (1993). To be sure, arbitration provides an informal, "efficient, inexpensive, and expeditious means for dispute resolution." Alexander v. Gardner-Denver Co., 415 U.S. 36, 58 (1974); see also Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 324 (2019). When entered into freely, arbitration agreements give the parties what they bargained for -- the opportunity to choose a skilled and experienced arbitrator in a specialized field to preside over and decide a dispute in a forum out of the public glare. Diverting cases from our overburdened civil justice system, moreover, allows more matters to be brought to a swifter conclusion.

Significantly, "[t]he Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, and the nearly identical New Jersey Arbitration Act (NJAA), N.J.S.A.

3

2A:23B-1 to -32, enunciate federal and state policies favoring arbitration." Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 440 (2014) (citing AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011); Hojnowski v. Vans Skate Park, 187 N.J. 323, 342 (2006); Martindale v. Sandvik, Inc., 173 N.J. 76, 92 (2002)). Arbitration agreements, however, are governed under general state contract principles. Id. at 441. Although the FAA and NJAA require that a court "place arbitration agreements on an equal footing with other contracts," ibid. (quoting Concepcion, 563 U.S. at 339), those Acts permit a court to invalidate an arbitration provision, like any other provision, "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2; Concepcion, 563 U.S. at 339; Martindale, 173 N.J. at 85.

General state contract principles authorize courts to invalidate contracts that contain terms that are unconscionable and in violation of public policy. Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 356 (1992). Consistent with those principles, on a number of occasions, we have exercised our authority to strike down unconscionable contract terms on public-policy grounds. See, e.g., Vitale v. Schering-Plough Corp., 231 N.J. 234, 247, 255-56 (2017); Muhammad v. Cty. Bank of Rehoboth Beach, Del., 189 N.J. 1, 15-16, 22 (2006); Vasquez v. Glassboro Serv. Ass'n, Inc., 83 N.J. 86, 104-05 (1980);

4

<u>Ellsworth Dobbs, Inc. v. Johnson</u>, 50 N.J. 528, 554-56 (1967). Industry-wide contracts of adhesion -- contracts that are offered on a take-it-or-leave-it basis -- that impose unconscionable terms will not be enforced by our courts. The classic example for this proposition is the landmark case of <u>Henningsen v. Bloomfield Motors, Inc.</u>, 32 N.J. 358, 385-408 (1960).

In <u>Henningsen</u>, we struck down on public-policy grounds the terms of a consumer contract for the purchase of an automobile that waived almost all warranties concerning the merchantability of the vehicle. <u>Id.</u> at 404, 408. The plaintiffs sued an automobile manufacturer and dealership for personal injuries and consequential damages after the purchased vehicle crashed as a result of a manufacturing defect in the car. <u>Id.</u> at 364-65. The manufacturer and dealership disclaimed liability for the personal injuries caused by the defective automobile, relying on the contract's warranty-waiver provision. <u>Id.</u> at 367, 404. The consumer contract "limit[ed] the manufacturer's liability to replacement of defective parts, and . . . disclaim[ed] all other warranties, express or implied." <u>Id.</u> at 386. The warranty-waiver provision was effectively an exculpatory clause. <u>See id.</u> at 372-73.

This Court recognized that the entire automobile industry had adopted similar exculpatory contract terms, giving consumer's "no real freedom of choice." <u>Id.</u> at 390-91, 404. The absence of freedom of contract was central to

5

our holding that the warranty-waiver provision violated public policy and therefore was invalid.  Id. at 391, 408.  We stated that

> [t]he gross inequality of bargaining position occupied by the consumer in the automobile industry is thus apparent.  There is no competition among the car makers in the area of the express warranty.  Where can the buyer go to negotiate for better protection?  Such control and limitation of his remedies are inimical to the public welfare and, at the very least, call for great care by the courts to avoid injustice through application of strict common-law principles of freedom of contract.
>
> [Id. at 391.]

The basic public policy at issue in Henningsen was the right of a purchaser to sue for defects in the manufacture of a vehicle, despite the automobile industry's form-contract disclaimers.  Id. at 377, 403-04.  When an entire profession or industry includes in an employment or consumer contract a provision that all statutory or common law disputes must be resolved only by arbitration, the public policy at risk is the freedom to choose a judicial forum and to exercise the constitutional right to a civil jury trial.

### B.

The right to trial by jury in civil cases is deeply rooted in New Jersey's history and "predates the founding of our Republic."  Allstate N.J. Ins. Co. v. Lajara, 222 N.J. 129, 134, 139-41 (2015).  In seventeenth-century New Jersey, then divided into the provinces of West and East Jersey, the right to a jury trial

6

was codified in two separate enactments. Id. at 139; see Charter or Fundamental Laws of West New Jersey ch. XXII (1676), http://www.njstatelib.org/wp-content/uploads/slic_files/imported/Research_Guides/Historical_Documents/nj/NJ05A.html; Fundamental Constitutions for the Province of East New Jersey in America art. XIX (1683), http://avalon.law.yale.edu/17th_century/nj10.asp. On July 2, 1776, New Jersey ratified its first Constitution, which declared "that the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal for ever." N.J. Const. of 1776 art. XXII. New Jersey's 1844 and 1947 Constitutions both reaffirmed that "[t]he right of trial by jury shall remain inviolate." N.J. Const. of 1844 art. I, ¶ 7; N.J. Const. art. I, ¶ 9.

The civil jury trial has historically played a preeminent role in our constitutional system of justice -- a system that places "trust in ordinary men and women of varying experiences and backgrounds, who serve as jurors, to render judgments concerning liability and damages." Cuevas v. Wentworth Grp., 226 N.J. 480, 499 (2016) (quoting Johnson v. Scaccetti, 192 N.J. 256, 279 (2007)). A jury trial is the ultimate example of self-government in a democratic society. Lajara, 222 N.J. at 134. To many, a verdict rendered by a jury has greater currency than a judgment coming from any single individual, whether a special master, an arbitrator, or even a judge.

7

Today, industry-wide employment and consumer contracts of adhesion with compelled arbitration provisions and forced waiver-of-rights clauses are rendering the right to a civil jury an anachronism. In considering the public-policy implications of this phenomenon, we must take account of what will be lost with the demise of the civil jury trial.

A trial by a jury of one's peers -- representing a cross-section and the diversity of society -- is infused with community values. <u>See</u> <u>ibid.</u> Though mistakes are unavoidable in any human enterprise, six jurors deliberating -- examining the evidence and testing one another's theories in the crucible of debate -- may be less prone to err than a solitary person whose views are not subject to challenge.

The right to a public trial ensures transparency that is absent from a closed arbitration proceeding. Transparency of court proceedings allows the public and the press to serve as watchdogs over our justice system and to be educated about how it functions. In an open judicial system, where grievances are aired in a public forum, citizens can learn the identities of companies that manufacture dangerous products; the identities of employers who sexually harass their employees or discriminate on the basis of nationality or religion; the identities of landlords who turn away renters on the basis of race; the identities of doctors, lawyers, and other professionals who repeatedly engage

8

in malpractice; the identities of home-improvement companies that engage in unconscionable practices; and much more. That valuable information that benefits an informed citizenry is kept under a veil of secrecy in arbitration proceedings. See Benjamin P. Edwards, Arbitration's Dark Shadow, 18 Nev. L.J. 427, 431 (2018) ("[I]ndustry-wide arbitration replaces a court's public benefit with secrecy. Because the public lacks meaningful oversight over arbitration, it cannot be assured that the process operates fairly. Importantly, arbitration also often removes the frequency, type, and result of disputes from the public eye, undercutting reputation's ability to police market behavior." (footnote omitted)).

Public accountability leads to corrective actions: procedures to eliminate discrimination in the workplace, safer products, safer medical procedures, and heightened integrity in consumer transactions. Additionally, arbitration typically does not provide comparable civil-trial discovery that may be needed to uncover well-concealed wrongdoing or negligence. Without access to civil trials and appellate review, there is no opportunity for the interpretation of complex legal principles in legislative schemes or for the development and refinement of our common law.

For those who <u>freely</u> choose the many benefits of arbitration, the trade-off is fair. They can voluntarily and knowingly waive their rights to access the courts through arbitration agreements. <u>See</u> <u>Atalese</u>, 219 N.J. at 442.

But for those who are herded into arbitration agreements through industry-wide employment and consumer contracts of adhesion, the admonitions in <u>Henningsen</u> are worthy of thoughtful consideration. In striking down the industry-wide waiver of warranties in <u>Henningsen</u>, this Court acknowledged the unequal bargaining power between consumers and automobile manufacturers and the potential harm to the public good posed by exculpatory clauses. 32 N.J. at 384. The <u>Henningsen</u> decision undoubtedly prodded the automobile industry to produce safer cars and therefore reduced the number of injuries caused by defective vehicles.

New Jersey's four-century-old commitment to the civil jury trial -- inscribed in all three of our State Constitutions -- is a self-evident expression of a paramount public policy. Viewed through the prism of general contract principles, industry-wide arbitration agreements in contracts of adhesion that compel an employee or consumer to waive his or her constitutional right to a civil jury trial and accept arbitration, <u>arguably</u>, would be unconscionable and violative of public policy. An arbitration agreement voided on that non-discriminatory basis would not appear to offend either the

10

FAA or NJAA.  See 9 U.S.C. § 2; Concepcion, 563 U.S. at 339; Martindale, 173 N.J. at 85; Henningsen, 32 N.J. at 384-408.

That issue is for another day and is not raised in the appeal before us.

For the present, I concur in the majority opinion.

Amy Skuse,

Plaintiff-Respondent,

v.

Pfizer, Inc., John D. Witzig,
Paul Mangeot, and Connie Corbett,
individually, jointly, severally and/or
in the alternative,

Defendant-Appellants.

CHIEF JUSTICE RABNER, dissenting.

I respectfully dissent largely for the reasons stated in Judge Sabatino's thoughtful opinion in Skuse v. Pfizer, Inc., 457 N.J. Super. 539 (App. Div. 2019). The decision carefully parses the online "training module" defendant Pfizer used. It also explains why the module lacks clear and unmistakable proof that Pfizer's employees agreed to waive the right to have their day in court.

I.

Basic contract principles apply to arbitration agreements. Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 307 (2019). To begin with, both sides must agree to any contract. If only one side consents, there is no "meeting of the minds" and no "legally enforceable agreement." Atalese v.

1

U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 442 (2014) (quoting Morton v. 4 Orchard Land Tr., 180 N.J. 118, 120 (2004)).  In short, "[a]n agreement to arbitrate, like any other contract, 'must be the product of mutual assent.'" Ibid. (quoting NAACP of Camden Cty. E. v. Foulke Mgmt., 421 N.J. Super. 404, 424 (App. Div. 2011)).

Beyond that, an arbitration agreement is a contract under which both sides agree to waive the right to proceed in court to resolve their disputes. Ibid. (citing Foulke, 421 N.J. Super. at 425).  For a waiver to be valid, the parties must knowingly and voluntarily give up their rights.  Knorr v. Smeal, 178 N.J. 169, 177 (2003).  Courts therefore look to the language of any waiver-of-rights provision to see if it "clearly and unambiguously" sets forth an agreement "to arbitrate the disputed claim."  Leodori v. Cigna Corp., 175 N.J. 293, 302 (2003); see also Atalese, 219 N.J. at 443-44, 448; Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001).

In light of those unremarkable principles, a valid waiver requires "an explicit, affirmative agreement that unmistakably reflects the employee's assent."  Leodori, 175 N.J. at 303 (emphases added).  In short, there must be (1) a provision that plainly alerts the parties they are giving up a right -- in this case, the right to litigate in court, and (2) clear and unmistakable proof that both parties agreed to the provision.

Application of those basic principles under state contract law does not run afoul of the Federal Arbitration Act (FAA). See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."); see also 9 U.S.C. § 2 (arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); Lamps Plus, Inc. v. Varela, 587 U.S. ___, 139 S. Ct. 1407, 1415 (2019) (citing First Options and observing that "courts may ordinarily" enforce arbitration agreements "by relying on state contract principles").

## II.

The documents Pfizer provided to its employees plainly called for arbitration of employment-related disputes. This appeal instead turns on the second of the above two elements: whether there is clear and unmistakable proof that Pfizer's employees assented or agreed to arbitration. Here, neither the "acknowledgment" of company policy that Pfizer elicited from its employees, nor a one-sided declaration that consent would be deemed by default, met that standard.

Pfizer first sent its employees an email that announced and outlined its arbitration policy. The message, by itself, could not and did not establish that

3

a recipient <u>agreed</u> to the policy. Pfizer suggests that assent can be found from the language of the training module it emailed the next day. That is not the case, however.

The first screen of the training module states that arbitration is a condition of employment with Pfizer and then adds, in clear language, "The next page contains the Mutual Arbitration and Class Waiver Agreement. You will be able to review and print the Agreement. You will then be asked to <u>acknowledge your receipt of the Agreement</u>." (emphasis added).

Words matter, and the words Pfizer used told its employees they would be asked to acknowledge they had <u>received</u> the Agreement. Not that they reviewed and agreed with it, or "consented to, ratified and accepted" the Agreement. Just that they had <u>received</u> it. Yet later in the training module, Pfizer used the very words "consented to, ratified and accepted" as a way to "deem" assent.

The second screen provides a way for employees to review and print the Agreement. That leads into the third screen, which reads as follows:

> [1] I understand that I must agree to the Mutual Arbitration and Class Waiver Agreement as a condition of my employment. [2] Even if I do not click here, if I begin or continue working for the Company sixty (60) days after receipt of this Agreement, even without acknowledging this Agreement, this Agreement will be effective, and I will be deemed to have consented to,

4

ratified and accepted this Agreement through my acceptance of and/or continued employment with the Company.

Immediately below, the following critical language appears: "CLICK HERE to acknowledge."[1]

The first part of the third screen contains a statement of company policy: arbitration is a condition of employment to work for Pfizer. Pfizer can set and enforce company policies that do not run afoul of "a clear mandate of public policy." See Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 71-72 (1980); accord Woolley v. Hoffmann-La Roche, 99 N.J. 284, 291-92 (1985). But Pfizer cannot declare that its employees agree with a policy and agree to waive their rights. Only the employees can speak for themselves. As with any contract, one side cannot simply declare that the other agrees; clear and unmistakable proof of assent on both sides is needed.

The module alternatively states that employees "will be deemed to have consented to, ratified and accepted this Agreement" if they continue to work for sixty days. But one side deeming consent by default suffers from the same flaw: it does not show clear and unmistakable proof that the other party agrees. As the Appellate Division correctly observed, Pfizer's "unilateral

[1] For purposes of Pfizer's motion to dismiss and compel arbitration, plaintiff Amy Skuse, who worked for Pfizer before the company terminated her employment, did not dispute that she saw the screen.

declaration" of consent "is an attempt to bypass" elementary principles of contract law. <u>Skuse</u>, 457 N.J. Super. at 563.

The cases cited by the majority do not compel a different outcome. <u>See ante</u> at ___ (slip op. at 23-24). In <u>Martindale v. Sandvik, Inc.</u>, the Court upheld an arbitration agreement set forth in an employment application. 173 N.J. 76, 81-82 (2002). Unlike here, the parties "executed a written agreement to arbitrate all claims against" the employer. <u>Id.</u> at 86. Similarly, in <u>Jaworski v. Ernst & Young U.S. LLP</u>, all three plaintiffs in the case signed <u>and assented</u> to at least one arbitration agreement. 441 N.J. Super. 464, 471, 473 (App. Div. 2015). Amy Skuse never did. <u>Skuse</u>, 457 N.J. Super. at 562-63.

And in <u>Weichert Co. Realtors v. Ryan</u>, the Court rejected a real estate broker's claim that a developer had agreed to pay the broker a ten-percent commission. 128 N.J. 427, 438-40 (1992). In the course of reviewing the broker's claim for breach of contract, the Court recounted a general principle that words or conduct can sometimes manifest assent and create an implied-in-fact contract. <u>Id.</u> at 436 (citing 1 <u>Williston on Contracts</u> § 91 (3d ed. 1957) and other sources). The Court then provided examples, such as "when an offeree accepts the offeror's services without expressing any objection to the offer's essential terms," and "when a party confers a benefit with a reasonable

6

expectation of payment." Id. at 436-37. Those situations are not instructive here.

The final page of Pfizer's training module likewise fails to offer clear and unmistakable proof of assent. It "thank[s]" employees for "reviewing the Mutual Arbitration and Class Waiver Agreement." (emphasis added). Again, the module makes no mention of "agreeing" or "consenting" to the Agreement, just "reviewing" it.

## III.

Assent or agreement can easily be established through an online module that is emailed or a written document sent in the mail.[2] Employers must simply use words of their own choosing that convey "the recipient has received and agreed to an arbitration policy." Leodori, 175 N.J. at 307. That was not done here.

There is no reason not to hold Pfizer to the words it chose: employees were expressly told they would be asked "to acknowledge . . . receipt of the Agreement" after having a chance to read it -- no more and no less. (emphasis added).

---

[2] The Appellate Division noted an obvious fact of modern-day life -- that employees can be inundated with emails at work, which they "frequently skim." Skuse, 457 N.J. Super. at 556. Nowhere, however, did the court rest its decision on Pfizer's use of email to convey its arbitration policy. See id. at 555-58. But see ante at ___ (slip op. at 28-33).

7

Consider a related example. The majority today plainly upholds the use of the online training module in this case. I received and reviewed the opinion and acknowledge the majority's position. Does that mean I agree with it? Of course not -- because "acknowledge" and "agree" do not necessarily mean the same thing. See Skuse, 457 N.J. Super. at 559 n.7 (citing Merriam-Webster's Collegiate Dictionary 11 (11th ed. 2003)). To establish clear and unmistakable proof of assent requires more than an acknowledgment.

The Court in Leodori made that clear. In that case, an employee signed an acknowledgment form that noted he "received" and "reviewed" the employer's handbook; the handbook contained a purported agreement to arbitrate. 175 N.J. at 297. The employee did not, however, sign a second form that stated he "agreed" to the arbitration policy. Id. at 298. The Court found the waiver invalid because it could not conclude the employee "clearly had agreed to it." Id. at 295.

As in this case, there was proof an employee understood and received a company's arbitration policy -- not that he agreed to it. Had he signed the second form, there would have been clear proof of assent. Id. at 307.

That did not mark the end of the Court's analysis, though. As the Court explained, without a signature on the latter form, the arbitration provision could not be enforced unless there was "some other explicit indication that the

8

employee intended to abide by that provision." Id. at 305 (emphasis added). There was none, just as there is no explicit indication of assent in this case.

Finally, to the extent language in Pfizer's agreement is open to another interpretation -- that employees not only received but also "agreed" in some way to Pfizer's waiver-of-rights policy -- the Agreement "should be construed against the drafter," who "'chose the words . . . susceptible to different meanings.'" Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) (quoting Kieffer v. Best Buy, 205 N.J. 213, 224 (2011)). In any event, an ambiguous agreement, by definition, cannot establish clear and unmistakable proof of assent.

## IV.

Many employers will understandably prefer the training module Pfizer used in this case. It is simpler to have employees click a screen and acknowledge they received a document, or to deem their consent by default, than it is to ask whether they agree to waive their right to resolve disputes in court. The module eliminates the need to follow up with individuals who disagree or fail to respond. But straightforward legal principles require both sides to assent to form a contract. It is not enough to "acknowledge" a statement of policy or to deem consent by default.

9

The majority rightly criticizes some of the language defendant used.  <u>See</u> <u>ante</u> at ___ (slip op. at 33-34, 39 n.3, 40).  Yet by upholding the so-called training module, I fear that today's opinion not only sanctions what took place but also ushers in a new day for arbitration agreements.  Going forward, what employer will ask an employee to <u>agree</u> to settle a dispute through arbitration and waive the right to proceed in court if it is enough simply to ask the employee to <u>acknowledge</u> she received a statement of company policy and deem consent from her continuing to show up for work?

More is required to show clear and unmistakable assent in any context.  More should be required before employees are asked to give up their constitutional and statutory rights to have their day in court.  For those reasons, I respectfully dissent.